IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JEFFREY DENTON, et al. | : | Case No. 1:02cv00422 |
| | : | |
| Plaintiffs, | : | Judge Beckwith |
| | : | Magistrate Hogan |
| v. | : | |
| | : | |
| COLUMBIA OLDSMOBILE, INC., et al., | : | **DEFENDANT COLUMBIA** |
| | : | **OLDSMOBILE, INC., ET AL'S MOTION** |
| Defendants. | : | **FOR SUMMARY JUDGMENT** |

Pursuant to Federal Rule of Civil Procedure 56, and for the reasons set forth in the attached Memorandum in Support, Defendant Columbia Oldsmobile, Inc respectfully moves for summary judgment on all counts of Plaintiffs Jeffrey Denton and Andre Tucker's Amended Complaint. In support of this Motion, Defendant submits the accompanying Memorandum in Support with attachments.

Respectfully submitted,

/s/Michael W. Hawkins
Michael W. Hawkins (0012707)
Dinsmore & Shohl LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, OH 45202
Telephone: 513-977-8200
Facsimile: 513-977-8141

Attorney for Defendants.

## MEMORANDUM IN SUPPORT

### Table of Contents

I.   STATEMENT OF FACTS ..................................................................................5

  A.  The Service Garage Was Home To Pranks And Practical Jokes ......................................5

  B.  Management Put An Abrupt Halt To The Pranks ..............................................................6

  C.  Denton Takes Matters Into His Own Hands And Confronts His Coworkers ....................7

  D.  Denton and Tucker's Work Related Performance And Behavior Declined To An
      Unacceptable Level ...........................................................................................................8

  E.  Tucker Is Terminated For Harassing And Threatening Coworkers ...................................9

  F.  Denton's Work And Behavior Continued To Deteriorate ..................................................9

  G.  Relevant Procedural History ............................................................................................10

II.  ARGUMENT ..............................................................................................................10

  A.  SUMMARY JUDGMENT SHOULD BE ENTERED FOR COLUMBIA ON
      PLAINTIFFS' DISPARATE TREATMENT CLAIMS BECAUSE PLAINTIFFS FAILED TO
      PRODUCE SPECIFIC FACTS ESTABLISHING A PRIMA FACIE CASE OR
      DEMONSTRATING THAT COLUMBIA'S LEGITIMATE NON-DISCRIMINATORY
      REASONS WERE PRETEXTUAL ..................................................................................10

          Patterson v. McClean Credit Union, 491 U.S. 164 (1989).. ............................. 11

          Betkerur v. Aultman Hospital Assoc., 78 F.3d 1079, 1094 (6th Cir. 1996) ....... 11

          Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992) ............................... 11

          Howard v. BP Oil Co., 32 F.3d 520 (11th Cir. 1994) ........................................ 11

          Little Forest Medical Center v. OCRC, 61 Ohio St.3d 607 (1991) .................... 11

          McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) ................................ 11

          Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981) ............... 11

          Thomas v. Ohio Dept. of Rehabilitation and Correction, 36 F.Supp. 2d 997 (S.D.
          Ohio 1998) ......................................................................................................... 12

      1. ... Because Plaintiffs Denton and Tucker Were Not Meeting Columbia's Legitimate
      Expectations For On The Job Conduct, They Were Not "Qualified" to Remain In
      Columbia's Employ ......................................................................................................... 12

2

Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993)............................................12

Brocklehurst v. PPG Industries, Inc., 123 F.3d 890 (6th Cir. 1997)..................12

McDonald v. Union Camp Corp., 898 F.2d 1155 (6th Cir. 1990)......................12

Simpson v. Midland-Ross Corp., 823 F.2d 937 (6th Cir. 1987)........................12

2. ... Plaintiffs Tucker and Denton Failed To Demonstrate That They Were Treated Less Favorably Than A Similarly Situated Non-Minority Employee .......................................16

Hartsel v. Keys, 87 F.3d 795 (6th Cir. 1996)......................................................16

Mitchell, 964 F.2d at 582-83..............................................................................16

Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344 (6th Cir. 1998)......16

Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796 (6th Cir. 1994)................16

3. ... Plaintiffs Failed to Show That Columbia's Articulated Legitimate Business Reasons For Its Actions Were Pretextual Or That The Real Reason For Columbia's Actions Was Plaintiff's Race...................................................................................................................18

Manzer v. Diamond Shamrock Chemicals, 29 F.3d 1078 (6th Cir. 1994).........19

St. Mary's Honor Center, 509 U.S. at 507 .......................................................19

B.    Summary Judgment Should Be Granted On Plaintiffs' Retaliation Claims Because Plaintiff Tucker Failed To Exhaust His Administrative Remedies and Both Tucker and Denton Failed To Present Any Facts Showing That A "Causal Connection" Existed Between His Protected Activity And The Alleged Adverse Employment Action Taken By Columbia. 22

Wren v. Gould, 808 F.2d 493 (6th Cir. 1987)....................................................23

Cooper v. City of North Olmstead, 795 F.2d 1265 (6th Cir. 1986) ...................23

1. ... Tucker Failed To Exhaust His Administrative Remedies .........................................24

Ang v. Procter & Gamble Co., 932 F.2d 540 (6th Cir. 1991)............................24

Love v. Pullman Co., 404 U.S. 522 (1972).......................................................24

Auston v. Schubnell, 116 F.3d 251 (7th Cir. 1997) ..........................................24

Price v. Harrah's Maryland Heights Operating Co., 117 F.Supp. 2d 919 (E.D. Mo. 2000)................................................................................................................24

McCray v. DPC Industries, Inc., 942 F.Supp. 288 (E.D. Tex. 1996)................24

2.     Tucker Did Not Even Mention Retaliation, Much Less Present EvidenceThat Would Show That There Was A Casual Connection Between His Termination And His Complaints Made To Management About The Pranks Pulled On Denton............................................ 23

......     Betkurer, 78 F.3d at 1096 ................................................................ 25

         Mitchell, 964 F.2d at 582 ................................................................ 25

         McDonald, 898 F.2d at 1162 ........................................................ 25

3. ... Denton Failed To Present Evidence That The Alleged Adverse Employment Actions Were Causally Connected To His Complaints To Management........................................ 24

         Betkurer, 78 F.3d at 1096 ................................................................ 25

         Mitchell, 964 F.2d at 582 ................................................................ 25

         McDonald, 898 F.2d at 1162 ........................................................ 25

4. ... Even If Plaintiffs Had Produced Sufficient Evidence To Support Their Prima Facie Retaliation Claims, They Failed To Adduce Any Evidence Showing That Columbia's Legitimate Non-Discriminatory Reasons For The Alleged Adverse Employment Actions Were Pretextual ...................................................................................... 256

C.     Plaintiffs' Race Harassment Claims Must Be Dismissed Because They Cannot Establish That The Alleged Harassment Was Based On Their Race Or That The Harassment Was Sufficiently Severe And Pervasive To Be Actionable............................................ 25

         Hafford v. Sneider, 183 F.3d 506 (6th Cir. 1999)............................................. 26

         Black v. Zaring Homes, Inc., 104 F.3d 822 (6th Cir. 1997)............................. 26

         Meritor Savings Bank v. Vinson, 477 U.S. 57 (1993)........................................ 26

         Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993)........................................ 26

1. ... Neither Plaintiff Established That The "Pranks" Were Based On Race .................... 27

         Turano Baking Co., 221 F.Supp. 2d 924 (N.D. Ill. 2002) ................................. 29

         McPhaul v. Bd. of Comm'rs, 226 F.3d 558 (7th Cir. 2000) ............................. 29

2. ... Neither Plaintiff Established That These "Pranks" Were Sufficiently Severe ........... 28

         Faragher v. City of Boca Raton, 524 U.S. 775 (1998) ....................................... 29

III.     CONCLUSION........................................................................................ 29

## I.     STATEMENT OF FACTS

On May 1, 1999, Jeffrey Denton ("Denton") was hired by Columbia Oldsmobile, Inc. ("Columbia") as a Lube Technician, making approximately $10.00 an hour. (Brodigan Dep. at 43). With Denton's recommendation, Andre Tucker ("Tucker"), Denton's nephew, was hired by Columbia, approximately four months later on September 9, 1999. (Denton Dep. at 274). Tucker, a high school drop-out, was hired as a Car Washer, making $7.00 an hour. (Denton Dep. at 274; Tucker Dep. at 7v.1; Tucker Dep. at 31v.1). Both Denton and Tucker worked in the service garage with several other technicians and service department employees.

## A.     The Service Garage Was Home To Pranks And Practical Jokes

Prior to and during Denton and Tucker's employment, the service garage was home to constant pranks and practical jokes. (Brodigan Dep. at 109-110). Before Denton and Tucker's arrival, for instance, Richard Frederick, a *Caucasian employee*, was the target of random pranks. (Denton Dep. at 72; Tucker Dep. at 104-106v.2). These pranks included spraying brake fluid onto his food, putting lithium grease on his hat, shoes, and socks, kicking over trash cans for him to pick-up, and putting "kick me" signs on his back. (Denton Dep. at 72; Tucker Dep. at 104-106v.2).

When Denton started at Columbia, he began noticing the persistency of these pranks and practical jokes. (Denton Dep. at 72). Believing that they were disrespectful and tasteless, Denton confronted the employees who were pulling the pranks. (Denton Dep. at 72). He demanded that the pranks stop. (Denton Dep. at 72). In addition to directly confronting his coworkers, Denton notified management of the pranks, explaining in his deposition that "I snitched on them." (Denton Dep. at 73).

After "snitching" on his coworkers about the pranks being played on Frederick, in Denton's own words, "that's…where my problems started." (Denton Dep. 73). The pranks were

then directed at Denton. (Denton Dep. at 74-75). His pop was intentionally knocked over, he was tripped, water bombs were exploded in his tool box, and other employees passed gas on him. (Denton Dep. at 76; Tucker Dep. at 98v.2). Denton characterized his coworkers' behavior as "childish pranks." (Denton Dep. at 75-76).

Once the pranks started, they continued, mainly because those committing the pranks viewed him as a "pushover." (Denton Dep. at 74). As Denton explained in his deposition, by letting these early pranks go, the pranks just continued. (Denton Dep. at 74). Throughout the early portion of Denton's employment, pranks were consistently played on him, as had been pulled on Frederick. (Denton Dep. 98-99; Denton Dep. at 185-186; Denton Dep. at 120-123; Denton Dep. at 127-129; Denton Dep. at 139-141). However, after the February 22, 2000 incident involving the employee break-room, discussed in detail below, management realized that the pranks were being taken too far. (Brodigan Dep. at 99).

## B.    Management Put An Abrupt Halt To The Pranks

On February 22, 2000, Denton was resting in the employee break-room. (Denton Dep. at 189). Two Columbia technicians, Mark Frye and Jeff Watts, decided to pull yet another prank. They closed the door to the break-room, placed a hose in the room, and filled the room with smoke. (Denton Dep. at 189). Their intent was to send an unpleasant odor into the break-room. (Exh. 1). Laughing hysterically, two of Denton's coworkers filled the break-room with smoke and Denton came running out. (Brodigan Dep. at 98; Tucker Dep. at 108v.2; Exh. 1).

Once Robert Brodigan, the service employee's supervisor, became aware of the incident, he quickly took steps to rectify the situation. He first instructed Denton to take the remainder of the day off. (Brodigan Dep. at 99). Brodigan then immediately confronted Frye and Watts to determine what exactly they had done and why. (Brodigan Dep. at 99). After meeting with Frye and Watts, and speaking with Linda Honican, the cashier who confirmed Denton's story, Brodigan realized that this incident was much more serious than the usual "pranks" pulled by the

6

service employees. (Brodigan Dep. at 99). Therefore, he reported the incident to his boss, Jim Peters. (Brodigan Dep. at 99).

Peters was not immediately available, but, the very next morning, Peters and Brodigan confronted Frye and Watts and informed them that disciplinary action would be taken once management had an opportunity to discuss the issue with Karl Stewart, the general manager. (Brodigan Dep. at 100). In further considering the situation, Columbia decided to have a formal shop meeting of the service employees in order to put a stop to the pranks. (Brodigan Dep. at 99; Denton Dep. at 228-229). At this meeting, Brodigan and Peters ordered that all pranks cease, threatening future transgressors with termination. (Denton Dep. at 228-229; Denton Dep. at 319). They further instructed those in attendance to immediately report any transgressor to management. (Denton Dep. at 320).

## C.    Denton Takes Matters Into His Own Hands And Confronts His Coworkers

Although Frye and Watts were suspended for three days, when Denton returned, several days after the incident, on or about February 24, 2000, he mistakenly believed that neither Watts nor Frye had been punished for their behavior. (Denton Dep. at 227-228; Denton Dep. at 210; Exh. 1).[1] Upset and believing that nothing was being done, Denton decided to take matters into his own hands, despite being instructed by Brodigan and Peters to let them handle the situation. (Denton Dep. at 210). Rather than heading their warning, Denton confronted his coworkers about the incident, proclaiming that he "was not going to take this from them anymore." (Tucker Dep. at 22v.2).

Visibly provoked, Denton began yelling emotionally at his coworkers, and Tucker immediately joined the fray, shoving and cursing the coworkers being confronted by Denton. (Tucker Dep. at 22-23v.2; Tucker Dep. at 30v.2; Tucker Dep. at 44v.1; Denton Dep. at 211;

---

[1]  At this point, Denton admitted that the pranks ceased. (Denton Dep. at 320).

Denton Dep. at 223-226; Plaintiffs' Amended Complaint, pg. 4, ¶ 24).[2]  Upon hearing Denton

yelling, Brodigan came out of his office and instructed Denton and Tucker to stop the

commotion and return to their work.  (Tucker Dep. at 24v.2; Denton Dep. at 226).  After

Brodigan left, the yelling resumed.  (Tucker Dep. at 27v.2).  Brodigan then ordered Denton and

Tucker into his office and fired them both.  (Tucker Dep. at 27v.2; Denton Dep. at 229).[3]

When it became apparent to Columbia that Denton's inappropriate behavior stemmed

from his mistaken belief that Frye and Watts were not being punished for the break-room

incident, Karl Stewart decided that Denton and Tucker's punishment was too severe.  (Tucker

Dep. at 32-33v.2).  Thus, both Denton and Tucker were rehired by Stewart after a three-day

suspension.  (Tucker Dep. at 32-33v.2).

## D.    Denton and Tucker's Work Related Performance And Behavior Declined To An Unacceptable Level

Following their rehire, Denton and Tucker's work related performance and behavior

declined to an unacceptable level.  In March, two Employee Disciplinary Reports were issued to

Denton for defective and improper work.  (Exhs. 9 and 10).  On March 16, 2000, Tucker was

given an Employee Disciplinary Report for making false comments about Karl Stewart, Bob

Brodigan, and Mr. Joseph, the owner of Columbia.  (Tucker Dep. at 52v.1; Exh. 3).  In fact,

when questioned about the incident, Tucker behaved in a cavalier manner, effectively admitting

to the charge.  (Tucker Dep. at 52-55v.1).  Specifically, he was asked in a pre-disciplinary

meeting what he had said about Karl Stewart.  In response, he stated that Karl Stewart allows

two "fuck boys" to get away with everything, referring to a fellow employee, Gary Umfelder,

and his supervisor, Robert Brodigan.  (Tucker Dep. at 53-54v.1).

---

[2] During his first deposition, Tucker also admits that he was saying "motherfucker" and other curse words.  Then he conveniently changes his story in his second deposition, which was taken almost two months after the first.  (Tucker Dep. at 27-28v.2).
[3] By his own admission, Denton had been involved in a similar altercation with a supervisor during his employment with Williams Ford.  (Denton Dep. at 276-277).

Their troubles continued into May and beyond.  In May, Denton received two more Employee Disciplinary Reports, one for defective and improper work, and the other for insubordination and improper conduct.  (Exhs. 11 and 12).  Denton received two more Employee Disciplinary Reports in June, one for leaving without permission and improper conduct, and the other for failure to obey orders.  (Exhs. 13 and 14).

**E.    Tucker Is Terminated For Harassing And Threatening Coworkers**

On June 26, 2000, Tucker was terminated by Karl Stewart, stemming from his continual harassment and verbal threats directed at his coworkers.  (Exh. 4).  On the day of his termination, Jim Peters called Tucker into Karl Stewart's office.  (Tucker Dep. at 58v.1).  When he entered, an Employee Disciplinary Report was sitting on Stewart's desk.  (Tucker Dep. at 58v.1; Exh. 4).  Peters and Stewart explained that they understood him to have threatened and chased a fellow employee, Scott Dick, with a golf club.  (Tucker Dep. at 65-66v.1).  When questioned about the accuracy of the report, Tucker responded "I don't sign shit but my check."  (Tucker Dep. at 59v.1).  Tucker then abruptly left Stewart's office.  (Tucker Dep. at 61v.1).  Thereafter, payroll was notified of his termination.

**F.    Denton's Work And Behavior Continued To Deteriorate**

Following Tucker's termination, Denton's work and behavior continued to deteriorate.  In July, he received three Employee Disciplinary Reports, two for defective and improper work, and another for improper conduct.  (Exhs. 15, 16, and 17).  The very next month, August of 2000, Denton received four Employee Disciplinary Reports; the first one for defective and improper work, the second for tardiness, the third for sleeping on the job, and the fourth for improper conduct.  (Exhs. 18, 19, 20, and 21).

From August 2000 through November 2000, Denton received several more Employee Disciplinary Reports.  (Exhs. 23-31).  By the end of November, it was clear to Columbia that Denton's performance and behavior had deteriorated to an unacceptable level.  He was

terminated on November 27, 2000 after receiving his 24th Employee Disciplinary Report in the span of just 10 months, several of which involved misconduct brought to Columbia's attention by its customers.  (Exhs. 8, 11, 27, and 32).

## G.    Relevant Procedural History

Several months after he was terminated, Denton filed a *pro se* Complaint against Columbia Motors Inc., Columbia Oldsmobile, Inc., and Robert Brodigan (collective referred to as "Columbia" or "Defendants") with this Court on June 11, 2002.  Coincidentally, on June 26, 2002, Tucker filed a Complaint with this Court.  The two cases were consolidated on November 1, 2002.  Then on January 16, 2003, Plaintiffs filed a motion to Amend their Complaint, which was granted on March 28, 2003.  Plaintiffs filed their Amended Complaint on April 2, 2003.  In that Amended Complaint, Plaintiffs allege the following causes of action: (1) disparate treatment under Title VII, 42 U.S.C. § 1981, and Ohio Revised Code 4112; (2) retaliation under Title VII and Ohio Revised Code 4112; and (3) racially hostile work environment under Title VII.

## II.    ARGUMENT

## A.    SUMMARY JUDGMENT SHOULD BE ENTERED FOR COLUMBIA ON PLAINTIFFS' DISPARATE TREATMENT CLAIMS BECAUSE PLAINTIFFS FAILED TO PRODUCE SPECIFIC FACTS ESTABLISHING A PRIMA FACIE CASE OR DEMONSTRATING THAT COLUMBIA'S LEGITIMATE NON-DISCRIMINATORY REASONS WERE PRETEXTUAL

In their Amended Complaint, Plaintiffs allege disparate treatment race discrimination in violation of Title VII, 42 U.S.C. § 1981, and Ohio Revised Code § 4112.  Specifically, Tucker claims that both of his terminations amounted to disparate treatment allegedly because other similarly situated white employees were not terminated.  (Plaintiffs' Amended Complaint at pg. 3, ¶s 11 and 14).[4]  Similarly, Denton claims that his terminations were discriminatory.

---

[4] Tucker also claims that Columbia's failure to promote him constituted disparate treatment.  (Plaintiffs' Amended Complaint at pg. 3, ¶ 12).  More specifically, Plaintiff Tucker claims in his Amended Complaint that he suffered an adverse employment action when he was not promoted to the position of Lube Technician.  However, there is absolutely no evidence that he ever requested a promotion to Lube Technician.  He was hired as a Car Washer, and he was terminated as a Car Washer.  Nowhere in his deposition, or in Denton's deposition for that matter, is there

(Plaintiffs' Amended Complaint at pgs. 4-5, ¶ 24 and 28). Denton also claims that his reduced work-load and his multiple Employee Disciplinary Reports amounted to disparate treatment. (Plaintiffs' Amended Complaint at pg. 5, ¶ 26). As convincingly demonstrated by the analysis below, each of Plaintiffs' disparate treatment claims fail as a matter of law.

It is well established that a claim brought under 42 U.S.C. § 1981 is to be analyzed under the same evidentiary framework applied to Title VII claims. Patterson v. McClean Credit Union, 491 U.S. 164, 186 (1989). See also Betkerur v. Aultman Hospital Assoc., 78 F.3d 1079, 1094 (6th Cir. 1996); Mitchell v. Toledo Hospital, 964 F.2d 577, 582 (6th Cir. 1992); Howard v. BP Oil Co., 32 F.3d 520, 524 n.2 (11th Cir. 1994). The same holds true for claims brought under Ohio Revised Code § 4112. Little Forest Medical Center v. Ohio Civil Rights Commission, 61 Ohio St.3d 607 (1991).

To survive summary judgment on his disparate treatment race discrimination claims, plaintiff has the initial burden of establishing a prima facie case of discrimination. Mitchell, 964 F.2d at 582, citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). A plaintiff who lacks credible "direct" evidence of intentional race discrimination, as do Plaintiffs here, may proceed with his claim only if he presents specific facts capable of establishing each element of a prima facie case under the McDonnell Douglas/Burdine framework, which requires a plaintiff to show that he was: (1) a member of a protected group; (2) qualified for the job held; (3) subject to an adverse employment action despite his qualifications; and (4) treated less favorably than similarly situated non-protected employees. Thomas v. Ohio Dept. of Rehabilitation and Correction, 36 F.Supp.2d 997, 1001 (S.D. Ohio 1998), citing Mitchell, 964 F.2d at 582-83. Because Plaintiffs

---

any evidence that Tucker requested or was ever denied a promotion, to any position, despite the fact that a significant portion of Tucker's first deposition was dedicated to discussing his work history and the circumstances surrounding his hiring at Columbia. (Tucker Dep. at 1-43v.1). Tucker's failure to even mention the circumstances surrounding a promotion is fatal to this claim.

failed to present evidence sufficient to establish elements two and four of their prima facie case,
summary judgment must be entered in favor of Columbia on Denton and Tucker's disparate
treatment claims.

> 1.    **Because Plaintiffs Denton and Tucker Were Not Meeting Columbia's
>        Legitimate Expectations For On The Job Conduct, They Were Not
>        "Qualified" to Remain In Columbia's Employ**

Discrimination barred by statute is a specific, limited concept. Hazen Paper Co. v.
Biggins, 507 U.S. 604, 610 (1993). It is not the role of the Court to examine a defendant
employer's business judgment as to employees' demonstrated job performance or lack thereof.
Brocklehurst v. PPG Industries, Inc., 123 F.3d 890, 898 (6th Cir. 1997) (a "discrimination action
is not a device which permits the jury to examine an employer's reasons for discharge and
determines that the employer's business judgment or policies do not appeal to its sensibilities").
In McDonald v. Union Camp Corp., 898 F.2d 1155 (6th Cir. 1990), the Sixth Circuit affirmed
summary judgment because the plaintiff did not perform his job "at a level which met his
employer's legitimate expectations." Id. at 1160. "If [the plaintiff] was not doing what his
employer wanted him to do, he was not doing his job" and thus was not "qualified." Id; see also,
Simpson v. Midland-Ross Corp., 823 F.2d 937, 940 (6th Cir. 1987) ("In order to show that he
was qualified, [the plaintiff] must show that he was performing his job at a level which met his
employer's legitimate expectations").

The adverse employment actions taken by Columbia were based on the fact that Denton
and Tucker were not "qualified." They simply were not "doing what [Columbia] wanted [them]
to do… ." McDonald, 898 F.2d at 1160. Plaintiffs were not subjected to adverse action despite
their qualifications. They were subjected to adverse employment action because of their
prohibited misconduct, which rendered them unqualified. Plaintiffs Tucker and Denton have
failed to present evidence to the contrary. Therefore, neither Denton nor Tucker can meet the

second element of their prima facie case, requiring this Court to enter summary judgment in favor of Columbia on their disparate treatment claims.

>   i.   *Denton and Tucker's February 22, 2000 Terminations Were Based On Their Failure To Meet Columbia's Legitimate Employment Expectations*

With respect to Denton, upon returning from leave after the break-room incident, he confronted the employees who had allegedly funneled the smoke into the break-room. (Tucker Dep. at 22v.2; Tucker Dep. at 30v.2; Denton Dep. at 211; Denton Dep. at 223-226). He was explicitly told not to take matters into his own hands. (Denton Dep. at 210). Columbia's management indicated that they would rectify the situation. (Denton Dep. at 210). And, in fact, management did take disciplinary action against the two employees responsible for the break-room incident. (Brodigan Dep. at 105). However, in direct contravention of his supervisors' instructions, Denton decided to take action against the employees responsible, ultimately confronting several coworkers directly. (Denton Dep. at 210).

While Denton was yelling emotionally at his coworkers, Tucker decided to enter the fray to "defend" his uncle. (Denton Dep. at 211; Denton Dep. at 223-226; Tucker Dep. at 22v.2; Tucker Dep. at 30v.2). In doing so, Tucker shoved several of the employees who Denton was confronting. (Tucker Dep. at 23v.2). Upon hearing the commotion, Denton and Tucker's supervisor, Brodigan, came out of his office and explicitly instructed Denton and Tucker to cease and return to their work. (Tucker Dep. at 24v.2; Denton Dep. at 226). Instead of heading these instructions, Denton and Tucker remained and the commotion started again when Brodigan was out of sight. (Tucker Dep. at 27v.2). Brodigan then returned, ordered Denton and Tucker into his office and terminated them both for their wrongful behavior. (Tucker Dep. at 27v.2; Denton Dep. at 229).

As this chain of events demonstrates, Denton disobeyed Columbia management on, not one, but two occasions after receiving explicit instructions. Denton's co-conspirator in the

ruckus, Tucker, similarly disobeyed an explicit order to return to work, creating a dangerous situation in the workplace. Clearly then, not only were Denton and Tucker engaging in inappropriate workplace behavior by physically and angrily confronting fellow employees, they committed insubordination by ignoring explicit orders from their supervisors.

Columbia, along with most other employers, expects its employees to avoid physical confrontation with coworkers and to respect and obey the instructions of supervisors. (Exhs. 2, 7, 29, and 23). By engaging in these acts, and violating Company policy, neither Plaintiff was meeting Columbia's legitimate expectations. Therefore, they were not "qualified" to remain in Columbia's employ when terminated.

> ii.    *Tucker's June 5, 2000 Termination Was Based On His Failure To Meet Columbia's Legitimate Employment Expectations*

Like his February 22, 2000 termination, Tucker's June 5, 2000 termination precipitated from his failure to meet Columbia's legitimate employment expectations. As outlined in Section I(D) above, Tucker was terminated on June 5, 2000 for repeatedly threatening and harassing fellow coworkers, which is contrary to Columbia's Policy Against Harassment and Discrimination. (Exhs. 2, 4, and 7). When confronted by management with the accusations, instead of giving an excuse or denying it, similar to the convenient after-the-fact explanation given during his deposition, Tucker refused to cooperate with management, stating that "I don't sign shit but my check." (Tucker Dep. at 58-59v.2). This type of disrespectful behavior toward management was, of course, not new. On March 16, 2000, during questioning by management about making ill-advised comments about management, he insulted his supervisor Robert Brodigan in front of Karl Stewart, Columbia's General Manger, calling him "fuck boy." (Denton Dep. at 53).

Certainly Columbia can expect its employees to not threaten coworkers and to not engage in insubordinate and disrespectful behavior towards supervisors. (Exhs. 2 and 7). Since Tucker

admittedly failed to meet these legitimate expectations, he was not "qualified" to remain employed with Columbia.  Therefore, summary judgment should be entered against Tucker on both of his state and federal disparate treatment claims.

>   iii.  *Denton's Lack Of Work, Employee Disciplinary Reports, And November 27, 2000 Termination Were Based On His Failure To Meet Legitimate Employer Expectations*

As with his February 22, 2000 termination, Denton's lack of work, his Employee Disciplinary Reports, and November 27, 2000 termination were the product of his failure to meet Columbia's legitimate employment expectations, which included, among other things, arriving to work on time, properly servicing vehicles, and, again, avoiding confrontations with fellow employees.  (Exhs. 7-30).  More specifically, from March of 2000 until his termination date, Denton committed innumerable violations of Columbia policy, all of which were well documented and presented to Denton.  (Exhs. 8-30).  Moreover, many of the violations that led to these Employee Disciplinary Reports were brought to the Columbia's attention by customers.  (Exhs. 8, 11, 27, and 32).  Denton conceded in his deposition that several of these Employee Disciplinary Reports were justified.  For instance, he admitted arriving late to work at least fifteen (15) times during his time with the dealership.  (Denton Dep. at 331).  In fact, he was admittedly 45 minutes late for work the entire week of June 23, 2000.  (Denton Dep. at 393-394).  He further admitted to taunting and "staring down" a fellow employee in the presence of Karl Stewart.  (Denton Dep. at 371-373; Exh. 20).  In addition, Denton admitted that he failed, on October 13, 2000, to satisfactorily perform an oil change by actually forgetting to fill a car completely with oil, which is assuredly the most fundamental task of a Lube Technician. (Denton Dep. at 391-392; Exh. 26).

Clearly then, Denton failed to meet Columbia's legitimate job requirements and expectations.  Because of this, Denton cannot show that he was "qualified," as required to make

out a prima facie case, and, therefore, his state and federal disparate treatment claims must fail as a matter of law.

### 2. Plaintiffs Tucker and Denton Failed To Demonstrate That They Were Treated Less Favorably Than A Similarly Situated Non-Minority Employee

Plaintiffs' race discrimination claims also fail as a matter of law because they failed to demonstrate the fourth element of their prima facie case, that they were treated less favorably than any similarly-situated non-minority employee. Hartsel v. Keys, 87 F.3d 795, 800 (6th Cir. 1996).

To establish this element, Plaintiff may compare himself only to non-protected employees who were "similarly situated in all respects." Mitchell, 964 F.2d at 582-83 (emphasis in original). See also, Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998) (plaintiff must "demonstrate that he or she is similarly-situated to the non-protected employee in all relevant respects"); Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)(plaintiff is "required to prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of the [non-minority's] employment situation"). To be deemed "similarly situated" in the context of alleged disparate discipline, the individual(s) with whom Plaintiff seeks to compare himself must have, inter alia, engaged in the same conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them for it. Mitchell, supra, 964 F.2d at 582-83.

> i.   *Tucker Failed To Identify A Similarly Situated White Employee Who Was Treated More Favorably*

Tucker was first terminated on February 22, 2000 for admittedly confronting the employees responsible for the break-room incident. Tucker admitted in his deposition that, in doing so, he shoved several employees during his uncle's emotional tirade. (Tucker Dep. at 22v.2; Tucker Dep. at 30v.2). Tucker further admitted that he failed to obey Brodigan's instructions to disband and return to work. (Tucker Dep. at 27v.2).

Tucker, however, failed to identify a white employee who was shoving other employees, or who acted as an accomplice to another employee's emotional tirade. Nor did he identify a white employee who ignored a supervisor's command, and was not subsequently terminated. Tucker failed to do so for good reason: there is no evidence of other similarly situated white employees. Based on the collective testimony of the Plaintiffs', the only other employee mentioned who was engaging in similar confrontational behavior was Denton. Denton was, of course, given the same punishment.

The same holds true for Tucker's second termination. Although Tucker identify several white employees who engaged in various pranks and practical jokes, he failed to identify any other similarly situated white employees who had threatened a coworker with a golf club and then subsequently acted cavalier when confronted by management about the incident.

As a result, Tucker did not satisfy an essential element of his prima facie case and his disparate treatment claims must, therefore, be dismissed.

> ii.    *Denton Failed To Identify A Similarly Situated White Employee Who Was Treated More Favorably*

With respect to each of Denton's alleged adverse employment actions, Denton failed to identify a similarly situated white employee who was treated more favorably. As for his February 22, 2000 termination, the record is silent regarding employees who angrily confronted a coworker or a group of coworkers and then subsequently ignored a supervisor's instructions to cease the confrontation and return to work.

As for his second termination, and the reduced work-load and Employee Disciplinary Reports that preceded his second termination, Denton failed to identify any other white employee who committed 24 Company violations over roughly 10 months. Like Tucker, he did identify several employees who engaged in pranks and practical jokes, but did not identify any employee who was consistently late for work, or who failed, on so many occasions, to discharge his

17

responsibilities in accordance with Columbia service standards and legitimate expectations. Denton did not even testify about the work load of other white employees, or the disciplinary history of other white employees.

Consequently, Denton did not satisfy an essential element of his prima facie case, requiring that his disparate treatment claims be dismissed.

### 3. Plaintiffs Failed to Show That Columbia's Articulated Legitimate Business Reasons For Its Actions Were Pretextual Or That The Real Reason For Columbia's Actions Was Plaintiff's Race

Even if Plaintiffs had presented facts sufficient to establish a prima facie case, summary judgment still must be granted in favor of Columbia because it articulated its legitimate business reasons for the actions Plaintiffs claim were discriminatory and Plaintiffs failed to demonstrate that Columbia's reasons were merely a pretext for race discrimination.

It is well established that if a Title VII plaintiff produces facts establishing his prima facie case, the burden of "production" shifts to the defendant to "articulate" a legitimate non-discriminatory reason for the employment action challenged by the plaintiff. Manzer v. Diamond Shamrock Chemicals, 29 F.3d 1078, 1082 (6th Cir. 1994). Once the defendant has stated its non-discriminatory reason, the plaintiff must demonstrate that the defendant's reason was merely a "pretext" and that the real reason for the adverse action was the plaintiff's race. Id. at 1083-85. The elements establishing a prima facie case are not sufficient by themselves to permit a conclusion that the reasons offered by the defendant are pretextual. Manzer, 29 F.3d at 1085. Rather, the plaintiff is required to come forward with affirmative evidence demonstrating that the articulated reason was a false pretext for prohibited discrimination. St. Mary's Honor Center, 509 U.S. at 507. The "ultimate burden of persuasion" remains with the plaintiff at all times. Id.

> i.    *Tucker And Denton Failed To Demonstrate That Columbia's Legitimate Non-Discriminatory Reason For Their February 22, 2000 Terminations Was Pretextual*

As outlined above, Columbia's reason for terminating Denton on February 22, 2000 was because he angrily confronted his coworkers and disobeyed, not one, but two explicit supervisor instructions. (Tucker Dep. at 27v.2; Denton Dep. at 229). Tucker's original termination was similarly motivated by his confrontational behavior and insubordination. (Tucker Dep. at 27v.2; Denton Dep. at 229).

In an attempt to show that this proposed reason was pretextual, Plaintiffs testified that Brodigan focused his attention on them during the February 22, 2000 confrontation, ignoring the other white employees who were being confronted by Denton. (Tucker Dep. at 24v.2). However, for numerous reasons, this alone is not enough to show pretext.

First, Denton and Tucker were the only employees engaging in angry and confrontational behavior. (See Section B(2)(i) and (ii)). Denton was yelling, and Tucker was shoving fellow employees. There was no testimony from either Plaintiff even suggesting that the employees who were being confronted reciprocated emotionally or physically. Because of this fact, Brodigan's focus on Denton and Tucker makes sense, and, thus, fails to show pretext.

Second, Denton and Tucker failed to identify anytime where Brodigan acted with racial animus during their employment. In fact, just the opposite is true. The record shows that Brodigan, and the dealership more generally, were free from racial bias. For instance, Denton admitted that Brodigan compassionately gave him lunch money after his food was injected with grease. (Denton Dep. at 130). Denton further admitted that Brodigan, Peters, and Stewart, would, on occasion, loan him money when he requested it. (Denton Dep. at 280-281). Moreover, Brodigan and Stewart hired both Denton and Tucker on two separate occasions, also showing that Brodigan, the supervisor who terminated them, harbored no racial animus. Consider also the fact that there is no history of racial problems at the dealership, and that one of

Columbia's most senior employees, Al Parker, is black.  Further consider the fact that Columbia has historically hired black employees, having employed Bill Larkin and Elmer Gentry most recently.

Third, and most importantly, Denton and Tucker's attempt to show pretext is undermined by their own deposition testimony. Tucker admitted during his deposition that after they were terminated Brodigan explicitly said to them "you guys get too emotional, and you should have to let me handle it." (Tucker Dep. at 30-31v.2).  This statement illustrates that Denton and Tucker's February 22, 2000 termination was based on their confrontational and emotional behavior, and their decision to ignore explicit management directives, and had nothing to do with their race.

Based on the foregoing, Denton and Tucker have failed to meet their burden of showing that Columbia's legitimate non-discriminatory reason for their February 22, 2000 termination was pretextual.  Therefore, this disparate treatment claim must fail.

> ii.    *Tucker Failed To Demonstrate That Columbia's Non-Discriminatory Reason For His March 16, 2000 Termination Was Pretextual*

Tucker was terminated on March 16, 2000 for harassing and threatening a fellow employee.  (Exh. 4).  With respect to this second termination, Tucker again failed to adduce any evidence demonstrating that Columbia's proposed justification for his termination was pretext. Actually, Tucker admitted that Columbia's proposed reasoning was genuinely held by his supervisors.  In his charge of discrimination filed with the Ohio Civil Rights Commission and EEOC, Tucker attested that "Karl Stewart…discharged me for verbally threatening a coworker, in violation of the company's harassment." (Exh. 5).  Furthermore, Tucker testified in his deposition that Karl Stewart believed, but was mistaken, that he had threatened a coworker.  (Tucker Dep. at 58v.2).  Whether Stewart was mistaken or not, is besides the point.  Rather, the employer's motivation is critical, and, in this situation, as conceded by Tucker, Columbia's motivation was solely its belief that Tucker had threatened another employee. (Tucker Dep. at 58v.2).

In light of these facts, Tucker cannot show that Columbia's legitimate non-discriminatory reason was pretextual, and, therefore, his disparate treatment claims must fail.

>   iii.    *Denton Failed To Demonstrate That Columbia's Legitimate Non-Discriminatory Reasons For His November 27, 2000 Termination, His Lack of Work, And The Employee Disciplinary Reports Were Pretexual*

Denton did not provide any evidence in his deposition demonstrating that his second termination, his lack of work, or the Employee Disciplinary Reports were motivated by anything other than his failure to observe Columbia employment policies. The multitude of Employee Disciplinary Reports were the product of Denton's inappropriate behavior and lackluster work performance. (See Section I(D) and (E) above). His reduction in work-load, and ultimate termination, were the product of the same. (See Section I(D) and (E) above). This Denton never disputes. In fact, Denton has produced absolutely no evidence to contradict the Company's proposed justification for these three alleged adverse employment actions. This alone prevents Denton from meeting his burden to show that the Company's proposed justification is pretext.

Not only can he not show pretext, but he concedes in his deposition that race was not the motivating factor behind these alleged adverse employment actions. (Denton Dep. at 308). Denton specifically admits in the following exchange that these three alleged adverse employment actions were retaliation for reporting the two employees responsible for the break-room incident:

>   **Q.**    *You didn't file your EEOC charge until August of 2000, right?*

>   **A.**    *I don't know. But I'm saying the carbon monoxide incident, from that point, that's when all this ruckus, and it just wouldn't stop. I got a disciplinary report every other day at Columbia Oldsmobile.* (Denton Dep. at 308-309).

Even though Columbia vehemently denies retaliating against Denton, for the purposes of showing pretext, Denton has conceded that race was not a factor in these so called "retaliatory

decisions." Rather, if Denton is believed, which is required for purposes of summary judgment, these adverse employment actions, or "ruckus" as he calls it, were motivated by his decision to "snitch" on his fellow employees over the break-room incident and not by his race.

Therefore, Denton has failed to show that Columbia's proposed justification for the alleged adverse employment actions were pretext, or that Columbia's actions were motivated by racial animus. As such, his disparate treatment claims must fail.

**B.    Summary Judgment Should Be Granted On Plaintiffs' Retaliation Claims Because Plaintiff Tucker Failed To Exhaust His Administrative Remedies And Both Tucker And Denton Failed To Present Any Facts Showing That A "Causal Connection" Existed Between His Protected Activity And The Alleged Adverse Employment Action Taken By Columbia**

To survive summary judgment on a claim of retaliation, a plaintiff must present evidence sufficient to establish: (1) that he engaged in protected activity; (2) that the employer knew of the protected activity; (3) that, thereafter, he was the subject of adverse employment action; and (4) that there is casual link between his protected activity and the adverse action of his employer. Wren v. Gould, 808 F.2d 493, 500 (6th Cir. 1987); Cooper v. City of North Olmstead, 795 F.2d 1265, 1272 (6th Cir. 1986). If a plaintiff establishes a prima facie case of retaliation, the familiar McDonnell Douglas/Burdine burden-shifting analysis applies, and the defendant has the opportunity to articulate the legitimate, non-discriminatory reason for its action. Wrenn, 808 F.2d at 500.

In the case at bar, Plaintiff Denton alleges in his Amended Complaint that his November 27, 2000 discharge, and his reduced work load and the Employee Disciplinary Reports that preceded his termination were in retaliation for complaining to management about the pranks being pulled on him. (Plaintiffs' Amended Complaint pg. 5, ¶ 28). Plaintiff Tucker claims that his June 26, 2000 termination was in retaliation for making similar complaints to management. (Plaintiffs Amended Complaint pg. 3, ¶ 11). Because neither Tucker nor Denton presented sufficient evidence showing the requisite causal link between their protected activity and the

alleged adverse action taken by Columbia, they failed to establish the fourth element of their

prima facie retaliation claim, and, therefore, summary judgment must be granted in favor of

Columbia.

### 1.    Tucker Failed To Exhaust His Administrative Remedies

It is well settled that in order for federal courts to have subject matter jurisdiction over a

Title VII claim, a claimant must first have successfully pursued administrative relief.  Ang v.

Procter & Gamble Co., 932 F.2d 540, 545 (6th Cir. 1991) citing Love v. Pullman Co., 404 U.S.

522 (1972).  If the claimant did not first present a claim to the Equal Employment Opportunity

Commission, that claim may not be brought before this Court.  Id.  The judicial complaint must

be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge

of discrimination.  Id.

With respect to Tucker's retaliation claim, he failed to check the box marked "retaliation"

on the charge and failed to refer to retaliation in the factual statement.  As such, his claim is

outside the scope of the charge and should be dismissed for failure to exhaust administrative

remedies.  Ang, 932 F.2d at 546-47; Auston v. Schubnell, 116 F.3d 251, 254 (7th Cir. 1997);

Price v. Harrah's Maryland Heights Operating Co., 117 F.Supp.2d 919, 921-22 (E.D. Mo. 2000);

McCray v. DPC Industries, Inc., 942 F.Supp. 288, 294 (E.D. Tex. 1996).

### 2.    Tucker Did Not Even Mention Retaliation, Much Less Present Evidence That Would Show That There Was A Casual Connection Between His Termination And His Complaints Made To Management About The Pranks Pulled On Denton

Tucker testifies in his deposition that he complained to management about the pranks

being pulled on his uncle Denton.  (Tucker Dep. at 35-36v.1).  He further testified, in some

detail, about his second termination on June 26, 2000, Columbia's proposed justification for his

termination, and his contention that Columbia's beliefs supporting that termination were

inaccurate.  (Tucker Dep. at 58v.2).  What is missing from his deposition testimony, and even the

Charge he filed with Ohio Civil Rights Commission and EEOC, are any facts that support his claim that his termination was retaliatory. The record is silent on the issue of retaliation all together. Tucker did not mention his alleged retaliation in his deposition, explicitly or implicitly. In fact, Tucker even failed to check the retaliation box on the EEOC charge form. (Exh. 5). The only time that Tucker alluded to retaliation was in his Amended Complaint. (Plaintiffs' Amended Complaint pg. 3, ¶ 11).

In light of the fact that Tucker has not identify one shred of evidence to support his retaliation claim, summary judgment must be entered in Columbia's favor.

### 3.    Denton Failed To Present Evidence That The Alleged Adverse Employment Actions Were Causally Connected To His Complaints To Management

Plaintiff Denton attributes his reduced work-load, his numerous Employee Disciplinary Reports, and his November 27, 2000 termination to retaliation taken by Columbia for complaining to management about the pranks being pulled on him. The record, however, consists of only one statement regarding his retaliation claim. During questioning about his consistent workplace misconduct, Denton randomly and incomprehensibly testified that "But I'm saying the carbon monoxide incident, from that point, that's when all this ruckus, and it just wouldn't stop. I got a disciplinary report every other day at Columbia" (Denton Dep. at 308).

As this statement clearly shows, Denton provided no evidence to support his retaliation claim other than a belief and a conclusory statement. Courts have uniformly held that speculative beliefs and conclusory assertions are insufficient as a matter of law to survive summary judgment. See, e.g., Betkurer, 78 F.3d at 1096; Mitchell, 964 F.2d at 582, 585; McDonald, 898 F.2d at 1162. Thus, Denton's retaliation claims must fail.[5]

---

[5] Also consider the fact that Denton admittedly complained to management prior to receiving all but one of these Employee Disciplinary Reports. (Exh. 8). Therefore, circumstantially, the Employee Disciplinary Reports stemmed from his poor work and inappropriate behavior. Otherwise, Denton would have received these reports from the outset, which began when he first arrived. (See Section I(A) above).

**4      Even If Plaintiffs Had Produced Sufficient Evidence To Support Their Prima Facie Retaliation Claims, They Failed To Adduce Any Evidence Showing That Columbia's Legitimate Non-Discriminatory Reasons For The Alleged Adverse Employment Actions Were Pretextual**

As conclusively established in Section IIA(3) above, Plaintiffs failed to produce any evidence whatsoever demonstrating that the alleged adverse employment actions were motivated by anything other than the legitimate non-discriminatory reasons proposed by Columbia.

For this reason too, summary judgment must be entered in favor of Columbia on Plaintiffs' retaliation claims.

**C.      Plaintiffs' Race Harassment Claims Must Be Dismissed Because They Cannot Establish That The Alleged Harassment Was Based On Their Race Or That The Harassment Was Sufficiently Severe And Pervasive To Be Actionable**

To establish a claim for race harassment, Plaintiffs must show that: (1) they are members of a protected class; (2) they were subjected to unwelcome racial harassment; (3) their harassment was based on race; (4) the harassment had the effect of unreasonably interfering with their work performance and creating an objectively intimidating, hostile or offensive work environment; and (5) there exists some basis for liability on the part of Columbia.  Hafford v. Sneider, 183 F.3d 506, 511 (6th Cir. 1999).

The Sixth Circuit has recognized that for alleged harassment to be actionable, "it must be 'sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment."  Black v. Zaring Homes, Inc., 104 F.3d 822, 825 (6th Cir. 1997) quoting Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1986).  Conduct that is "merely offensive" is not, as a matter of law, actionable harassment.  Black, 104 F.3d at 826 quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).  The conduct must be objectively and subjectively hostile and offensive.  Harris, 510 U.S. at 21-23.

### 1.    Neither Plaintiff Established That The "Pranks" Were Based On Race

The record evidence shows that pranks were never pulled on Al Parker, who is a black man (Denton Dep. at 337).  Denton even admitted that everyone treated Parker with respect. (Denton Dep. at 338).  Moreover, some of the very same pranks pulled against Denton were admittedly pulled on Richard Frederick, a Caucasian employee.  (Denton Dep. at 337).  Denton was replaced by an African American, Cedric Rosier.  (Brodigan Dep. at 51).  Even more importantly, Tucker, an African American, admitted that he was never the subject of these pranks.  (Tucker Dep. at 123v.2).  Circumstantially, therefore, the pranks were based on something other than race.

Denton identified that something during his deposition testimony.  In the following two exchanges, Denton admits that the pranks, although accompanied on occasion by racially charged-statements, were not based on race:

**Q.**    *Okay.  So prior to Andre being hired, you didn't have any problems with the employees at Columbia Oldsmobile?*

**A.**    *No.*

**Q.**    *Okay.*

**A.**    *They didn't know me.*

**Q.**    *But you did observe that pranks were going on?*

**A.**    *Yeah.*

**Q.**    *And those pranks involved Richard Fredericks?*

**A.**    *The majority of them.*

**....**

**Q.**    *Okay.  Now, when you saw them do these things, mischievous things to Richard Frederick, did you tell them about it, that they shouldn't be doing it?*

**A.**    *And gradually that's how they -- yes, yes.*

...

**Q.**    *Who did you tell?*

**A.**    *I told Bob Brodigan and Jim Peters.*

**Q.**    *Okay so you told them?*

**A.**    *I snitched on them. I snitched on them, which I didn't have a problem with them. I snitched, and that's probably where my problems started.*  (Denton Dep. at 71-73).

Later in Denton's deposition, this second exchange took place:

**Q.**    *Now, can you tell me when is the first incident that occurred involving mischievous -- or mischief or a prank against you?*

**A.**    *No, I can't tell you when.*

**Q.**    *Okay. When do you believe it first started that you were being harassed by employees at Columbia Oldsmobile?*

**A.**    *When do I believe? It was before my nephew came on.*

**Q.**    *And what -- what happened for you to believe that you were being harassed by employees at Columbia Oldsmobile.*

**A.**    *Actually, Scott Dick informed me that I'm actually a pushover, they treat you the way they do because you don't do anything. So you know, putting -- knocking my pop over, sticking their foot out to trip me. You know, I'm an adult. It's childish pranks. And they just induced -- as I let small ones go, they induced and go bigger.*  (Denton Dep. at 74-75).

Based on his own testimony, Denton admits that race was not the factor motivating his coworkers' pranks. Instead, the pranks began because he "snitched" on his fellow workers about the pranks being pulled on Richard Frederick, a white employee, and the pranks continued because his fellow employees viewed Denton as a "pushover."

Other than identifying a few pranks that were allegedly racial in tone, Tucker never presented evidence to contradict Denton's proposed motivation. And, as the courts have made

clear, "occasional use of racial epithets by coworkers not motivated by racial animus does not

create a hostile work environment." Turano Baking Co., 221 F.Supp.2d 924, 931 (N.D. Ill.

2002)(also holding that the plaintiff's "undetailed claims of coworker slurs are insufficient to

allege a hostile work environment"); McPhaul v. Bd. of Comm'rs, 226 F.3d 558, 567 (7th Cir.

2000).

    Consequently, Denton and Tucker's racial harassment claims must be dismissed for this

reason alone.

### 2.    Neither Plaintiff Established That These "Pranks" Were Sufficiently Severe And Pervasive In A Subjective Sense To Constitute Racial Harassment

    To satisfy the fourth element of their race harassment claim, Plaintiffs must show, not

only that the alleged harassment was objectively intimidating, hostile or offensive, but they must

also show that the harassment was subjectively intimidating, hostile or offensive.  This the

Plaintiffs cannot do.  Both Denton and Tucker failed to adduce evidence that the "pranks" pulled

on Denton were subjectively intimidating, hostile or offensive.

    First, neither Denton nor Tucker testified about the impact these self-entitled "pranks"

had on their work environment.  Their testimony was limited to identifying the pranks and

explaining the circumstances surrounding them.  A review of their record testimony, however,

shows there to have been no impact on their work environment.  Both Denton and Tucker's work

performance was satisfactory during the time when the pranks were being pulled.  (See Section I

above).  It was not until after the break-room incident that they began having work troubles.

(See Section I(D) above).  But, the pranks had admittedly ceased at that point, presumably

because of the ultimatum given to the employees by management.  (Denton Dep. at 174-175).

    Second, the record convincingly reflects that Tucker and Denton did not view the pranks

as hostile, intimidating or offensive.  To begin with, Tucker admits that pranks were never pulled

on him during his entire tenure at the dealership.  (Tucker Dep. at 122-123v.2).  Tucker also

specifically admitted that his coworkers never "harassed" him.  (Tucker Dep. at 123v.2).

Additionally, and more importantly, Denton uniformly throughout his deposition characterized

his fellow employees' behavior as "pranks."  He even characterized these "pranks" as "childish

pranks."  (Denton Dep. at 76).  As the Supreme Court has made clear, Section 1981 and Title VII

are not "general civility codes."  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998).

     As such, this Court must find in favor of Columbia on Plaintiffs' racial harassment

claims.

## II.    <u>CONCLUSION</u>

     As the foregoing demonstrates, Defendants are entitled to summary judgment on all of

Plaintiffs' claims.

    •    Plaintiffs failed to establish their *prima facie* disparate treatment claims by not

adducing evidence demonstrating that they were "qualified" or that other similarly situated

employees were treated more favorably; even had Plaintiffs done so, they still failed to present

specific evidence showing that Defendants' legitimate non-discriminatory reasons were

pretextual.

    •    Plaintiffs' failed to demonstrate that the adverse employment actions taken by

Defendants were causally connected to any protected activity; even had Plaintiffs done so,

however, they still failed to produce any evidence showing that Defendants' legitimate non-

discriminatory reasons were pretextual.

    •    Plaintiffs failed to demonstrate that the "pranks" pulled on Denton were based on

his race or that these "pranks" were sufficiently severe and pervasive to be actionable.

     Therefore, Defendants respectfully request this Court dismiss Plaintiffs' claims in their

entirety.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 28, 2005, a copy of the foregoing Motion for Summary Judgment was filed electronically.  Notice of this filing will be sent to the following by operation of the Court's electronic filing system:


Jim Rimedio 810 Matson Place                     Jay R. Langenbahn
704 Queen's Tower                                Lindhorst & Dreidame
Cincinnati, OH  45204-1444                       312 Walnut St., Suite 2300
Telephone:  513-244-2345                         Cincinnati, Ohio 45202
Facsimile:  513-244-2620                         Telephone: 513-421-6630
                                                 Facsimile:  513-421-0212


Attorney for Plaintiffs


                                   <u>/s/Michael W. Hawkins</u>
                                   Michael W. Hawkins (0012707)
                                   Dinsmore & Shohl LLP
                                   1900 Chemed Center
                                   255 East Fifth Street
                                   Cincinnati, OH  45202
                                   Telephone:  513-977-8200
                                   Facsimile:  513-977-8141


                        Attorney for Defendants.