1

1        UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF OHIO

3            WESTERN DIVISION

4              -   -   -

5   JEFFREY DENTON, ET AL.,    :

6          PLAINTIFFS,   :

7      -VS-            : CASE NO. C-1-02-466

8   COLUMBIA OLDSMOBILE,    :

9   ET AL.,              :

10         DEFENDANTS.   :

11              -   -   -

12        Deposition of ANDRE LARON TUCKER, a

13   plaintiff herein, taken by the defendants as upon

14   cross-examination pursuant to the Federal Rules of

15   Civil Procedure and pursuant to agreement and

16   stipulations hereinafter set forth at the offices

17   of Ivan L. Tamarkin, Esq., 830 Main Street, Suite

18   999, Cincinnati, Ohio, at 2:55 p.m. on Tuesday,

19   November 5, 2002, before Lois A. Roell, RMR, a

20   notary public within and for the State of

21   Kentucky.

22              -   -   -

23

24

2

1    APPEARANCES:

2      On behalf of the Plaintiffs:

3            Ivan L. Tamarkin, Esq.

4            830 Main Street, Suite 999

5            Cincinnati, Ohio  45202

6      On behalf of the Defendants:

7            Jay R. Langenbahn, Esq.

8                 of

9            Lindhorst & Dreidame Co., LPA

10           312 Walnut Street, Suite 2300

11           Cincinnati, Ohio  45202

12      Also Present:

13           Jeffrey Denton

14                 -   -   -

15              S T I P U L A T I O N S

16           It is stipulated by and between counsel

17    for the respective parties that the deposition of

18    ANDRE LARON TUCKER, a plaintiff herein, may be

19    taken as upon cross-examination pursuant to the

20    Federal Rules of Civil Procedure and pursuant to

21    agreement; that the deposition may be taken in

22    stenotypy by the notary public-court reporter and

23    transcribed by her out of the presence of the

24    witness; that the jurisdiction of the notary

Spangler Reporting Services, Inc.

PHONE (513) 381-3330    FAX (513) 381-3342

3

1   public-court reporter is waived; that the

2   transcribed deposition is to be submitted to the

3   witness for his examination and signature, and

4   that signature may be affixed out of the presence

5   of the notary public-court reporter.

6                          -   -   -

7                      I N D E X

8   WITNESS                      CROSS-EXAMINATION

9   Andre Laron Tucker                    5

10                         -   -   -

11                  E X H I B I T S

12  DEFENDANTS' EXHIBITS                      MARKED

13  No. 1, a 2-page document entitled        38

14     "Application for Employment."

15  No. 2, a xerox copy of an Ohio driver's  41

16     license and a Social Security card.

17  No. 3, a document entitled "Payroll      41

18     Change" dated October 5, 1999.

19  No. 4, a document entitled "Payroll      43

20     Change" dated February 24, 2000.

21  No. 5, a document entitled "Employee's   45

22     Withholding Allowance Certificate."

23  No. 6, a document entitled "Employee     45

24     Disciplinary Report" dated 3/16/00.

4

1    No. 7, a document containing the sentence        58

2        "You are being terminated as of June

3        26, 2000 for your continual harassment

4        and threatening of fellow employees."

5                          -   -   -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                                    (Witness sworn.)

2                    MR. LANGENBAHN:  Sir, my name is

3      Jay Langenbahn, I represent Columbia Oldsmobile

4      relative to this suit that you filed in the

5      Federal District Court against them.  I'm going to

6      ask you some questions.  If you don't understand

7      my question, please tell me, I'll attempt to

8      clarify the question.  If the question calls for a

9      yes or no answer, please state audibly yes or no

10     so the court reporter can get your answer on the

11     record.  Okay?

12                    THE WITNESS:  (Nodding head.)

13                    MR. LANGENBAHN:  You need to say

14     yes to --

15                    THE WITNESS:  Oh, yes.

16                    MR. LANGENBAHN:  If I ask you a

17     question, you need to respond verbally, okay?

18                    THE WITNESS:  Okay.

19                    ANDRE LARON TUCKER

20     of lawful age, a plaintiff herein, being first

21     duly sworn as hereinafter certified, was examined

22     and deposed as follows:

23                    CROSS-EXAMINATION

24     BY MR. LANGENBAHN:

1      Q.   State your name, please.

2      A.   Andre Tucker.

3      Q.   Do you have a middle name?

4      A.   Laron.

5      Q.   And what's your present residence

6  address?

7      A.   3727 Zinsle, Z I N S L E.

8      Q.   Zinsle?

9      A.   Z I N S L E, Zinsle.

10     Q.   Avenue?

11     A.   Yes.

12     Q.   Where is that?

13     A.   Kennedy Heights, 45213.

14     Q.   And, sir, how old are you?

15     A.   Twenty-five.

16     Q.   And your date of birth?

17     A.   1/29/77.

18     Q.   And your Social Security number?

19     A.   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.

20     Q.   And where were you born?

21     A.   Cincinnati, Ohio.

22     Q.   Have you been a lifelong resident of

23  Cincinnati?

24     A.   Yes.

```
 1              Q.    And how far did you go in school?

 2              A.    Twelve.

 3              Q.    What school?

 4              A.    Woodward.

 5              Q.    And what year did you graduate from

 6   Woodward High School?

 7              A.    I didn't come out of there.

 8              Q.    You didn't graduate?

 9              A.    No.

10              Q.    So you've gone 12 years, but you

11   didn't graduate?

12              A.    No.

13              Q.    So you don't have a high school

14   diploma?

15              A.    No.

16              Q.    Do you have a GED?

17              A.    No.

18              Q.    Do you have any military service?

19              A.    No.

20              Q.    What year did you attend the 12th

21   grade at Woodward?

22              A.    1994.

23              Q.    Are you married?

24              A.    No.
```

8

```
 1            Q.    Have you ever been married?

 2            A.    No.

 3            Q.    Do you have any children?

 4            A.    No.

 5            Q.    Who do you live with at the present

 6   time?

 7            A.    My father and my uncle.

 8            Q.    Father is?

 9            A.    Andre J. Denton.

10            Q.    Andre J. Denton?

11            A.    (Nodding head.)

12            Q.    And your uncle?

13            A.    Craig M. Denton.

14            Q.    Craig M. Denton.  You carry the name

15   Tucker, is that your mother's name?

16            A.    That's my mother's maiden name.

17            Q.    What's her first name?

18            A.    Michelle.

19            Q.    Michelle?

20            A.    Yes.

21            Q.    Where does she live?

22            A.    That's not her last name.

23            Q.    What's that?

24            A.    That's not her last name.
```

9

```
1          Q.    Her last name is not Tucker?

2                MR. TAMARKIN:  Not now.

3          Q.    What's her last name now?

4          A.    Jones.

5          Q.    But her last name was Tucker when

6    you were born?

7          A.    (Nodding head.)

8                MR. TAMARKIN:  You have to say yes.

9          A.    Yes.

10         Q.    I'm sorry.  Where does Michelle

11   live?

12         A.    2222 Langdon Farm.

13         Q.    Cincinnati?

14         A.    Yes.

15         Q.    So your father is Andre Denton and

16   your mother is Michelle Tucker Jones, right?

17         A.    (Nodding head.)

18         Q.    True?

19         A.    Yes.

20         Q.    Let me just ask you, do you have any

21   brothers or sisters by these two individuals?

22         A.    Yes.

23         Q.    Do you have brothers and sisters by

24   Andre Denton and Michelle Tucker Jones?
```

1        A.    Yes.

2        Q.    How many brothers and sisters?

3        A.    I have a total of three brothers and

4    two sisters.

5        Q.    And all these three brothers and two

6    sisters have the same common parents?

7        A.    No.

8        Q.    That's my question, who -- how many

9    brothers and sisters do you have by the same

10    individuals, Andre Denton and Michelle Tucker

11    Jones?

12        A.    Just me and my brother.

13        Q.    And your brother's name is?

14        A.    Alexander J. Tucker.

15        Q.    Okay.  And then is it my

16    understanding then that Jeff Denton then is the

17    brother of Michelle Tucker Jones?

18        A.    No.

19        Q.    That wouldn't be right.  I'm sorry.

20    Jeff Denton is the brother of Andre Denton?

21        A.    Yes.

22        Q.    Can you tell me about your

23    employment since 1994 up through the present?

24        A.    1994, well, between 1994 and to the

11

1    present, for nine months I was in Job Corps in

2    Atterbury, it's called Atterbury, it's in

3    Edinburg, Indiana.

4            Q.    Atterbury, when was that?

5            A.    In '94, November 2nd of '94 till

6    May -- well, six months, May of '95.

7            Q.    You worked for the Job Corps?

8            A.    Yeah.

9            Q.    But give me the name, I just don't

10   understand the name, Attinbury?

11           A.    That's the name of the facility,

12   Atterbury.

13           Q.    Atterbury.  Who was your employer,

14   was that the U.S. Government?

15           A.    That's the U.S. Government.

16           Q.    Okay.  And what did you do for the

17   Job Corps?

18           A.    I was trying to get a skill, trade

19   skill.

20           Q.    Okay.  What type of skill?

21           A.    First I started off at building

22   department maintenance.

23           Q.    Then what?

24           A.    Welding.

Spangler Reporting Services, Inc.

PHONE (513) 381-3330    FAX (513) 381-3342

12

1          Q.    Then what?

2          A.    That's it.

3          Q.    Okay.

4          A.    Culinary artist, culinary artist

5 too.

6          Q.    And then is this like a job, you

7 have permanent employment with them or does work

8 only last for a certain period of time?

9          A.    If you complete.

10         Q.    What's that?

11         A.    If you complete.

12         Q.    If you complete, what?

13         A.    The trade, each trade takes a

14 certain amount of time.

15         Q.    Okay. So how long were these trades

16 going to take?

17         A.    Culinary would take eight months,

18 welding would take between six and nine months,

19 and building and department maintenance takes six

20 months.

21         Q.    So from what you're telling me, you

22 apparently didn't complete the trades; is that

23 right?

24         A.    No.

13

1        Q.    And why not?

2        A.    I left.

3        Q.    So you left voluntarily?

4        A.    Yes.

5        Q.    This isn't something where you sign

6 up and you have to be there for a period of time,

7 is it, you can leave voluntarily?

8        A.    If you're 18, you could voluntarily

9 leave yourself.

10       Q.    And you did that, right?

11       A.    Yes.

12       Q.    Because you just didn't like it?

13       A.    There was more things to it than

14 that.

15       Q.    More what?

16       A.    There was more things to it than

17 that.

18       Q.    Tell me what it was.

19       A.    For one, I was homesick.

20       Q.    Okay.  Anything else?

21       A.    And that part up there, it was in a

22 very racist area of Indiana.

23       Q.    So you're saying up where you

24 were -- Whereabouts in Indiana were you?

14

1          A.    Edinburg, Indiana.

2          Q.    Where is Edinburg, Indiana?  I don't

3    know.

4          A.    It's about 45 miles west of

5    Indianapolis, 20 miles east of Columbus, Indiana.

6          Q.    So you didn't like the area because

7    it was very racist?

8          A.    Yes.

9          Q.    Can you give me some instances where

10   things happened that gave you an indication that

11   it was very racist?

12         A.    For one, there's an army base across

13   the street.  They had been dispatched over there

14   before numerous times for intimidations by the Ku

15   Klux Klan.

16         Q.    What's the army base?

17         A.    I couldn't tell you.

18         Q.    Okay.  Anything else?

19         A.    Different treatment of minorities,

20   not just counting blacks, Spanish, all different

21   types minorities.

22         Q.    I mean, how do you know there was

23   different treatment of minorities?

24         A.    Because our shop teacher would

15

1    deliberately do things to try and get the blacks

2    in trouble.  Like it's an automatic expulsion from

3    the program if you mess with fire alarms or

4    anything like that, and it was found out that he

5    did that.

6           Q.   So you're saying your shop teacher

7    you believe was a racist; is that right?

8           A.   It was proven.

9           Q.   Okay.  What's the shop teacher's

10   name?

11          A.   I don't know, I can't remember.

12          Q.   When you say it was proven, tell me

13   how it was proven.

14          A.   They did an investigation that he

15   had blamed our class for hitting alarms, and then

16   when they took fingerprints, it was him.

17          Q.   His fingerprints?

18          A.   His fingerprints.

19          Q.   Any other instances of racism that

20   you're aware of?

21          A.   Not that I know of.

22          Q.   So you left that job with the Peace

23   Corps and came back to Cincinnati?

24          A.   Yes.

16

1          Q.    And you left the job because you

2   were homesick and because of racism, right?

3          A.    Yes.

4          Q.    And then when you came back to

5   Cincinnati, what did you do?

6          A.    What did I do, I believe I started

7   working for Jergens for a temporary service,

8   something like that.

9          Q.    Jergens?

10         A.    Yes, I believe so.

11         Q.    Temporary service?

12         A.    Yes.

13         Q.    So just in point of time, you

14  worked, you've already testified, November 2nd,

15  1994 through May of '95 for the Peace Corps,

16  right?

17         A.    Job Corps.

18             MR. TAMARKIN:  Job Corps.

19         Q.    Job Corps.

20             MR. TAMARKIN:  I was going to say.

21         Q.    When did you start working for

22  Jergens?

23         A.    Probably like June.  I didn't work

24  there that long.

Spangler Reporting Services, Inc.

PHONE (513) 381-3330    FAX (513) 381-3342

1          Q.    So June of 1995 through what period?

2          A.    It was temporary, so I had to keep

3     finding temporary until I got on somewhere.

4          Q.    So the job at Jergens was only a

5     temporary job?

6          A.    Yeah.  Then after that I worked at a

7     nursing home.

8          Q.    What nursing home?

9          A.    Arcadia Manor.

10         Q.    Where is Arcadia Manor Nursing Home?

11         A.    It's no longer called Arcadia Manor,

12    but it's on Ridge, off of Ridge.

13         Q.    Okay.  What did you do there?

14         A.    I was basically a housekeeper.

15         Q.    What did you do as a housekeeper?

16         A.    Cleaned patients' rooms, bathrooms,

17    fed patients.

18         Q.    And what period of time did you work

19    for Arcadia Manor Nursing Home?

20         A.    For the summer.

21         Q.    Summer of 1995?

22         A.    '95, '96, yeah, that summer,

23    somewhere in there.

24         Q.    Why did you leave that employment?

1        A.    Why did I leave that employment?  I

2  was terminated from there.

3        Q.    So you were fired?

4        A.    Yes.

5        Q.    And why were you fired?

6        A.    Because the owner, I was switching

7  from second shift to first shift, and I -- We got

8  into an argument, me and the owner, because he

9  tried to make me clean up feces without a rubber

10  glove.

11        Q.    And you objected to that and you

12  were terminated?

13        A.    No, that's not what happened right

14  there.

15        Q.    Well, what happened?

16        A.    They sent me on lunch, and then when

17  I got back, he didn't terminate me, he told

18  someone else tell him to leave, I don't like him.

19        Q.    Do you think there was any issues

20  involving racism relative to that?

21           MR. TAMARKIN:  Objection.

22        A.    I can't speak for that man.

23        Q.    Was the individual who terminated

24  you, was that individual white?

19

1          A.    He was foreign, that's all I know.

2          Q.    Okay.  You weren't terminated from

3    your job at Jergens, were you?

4          A.    No.

5          Q.    You just left voluntarily?

6          A.    It was just temp.

7          Q.    Part-time job?

8          A.    Temp to hire, they didn't pick me

9    up.

10         Q.    Okay.  So then what's your next

11   employment after Arcadia?

12         A.    I ran a store with my friend, my

13   uncle.

14         Q.    Who's the friend?

15         A.    Denarius.

16         Q.    What's the name?

17         A.    Denarius.

18         Q.    Last name?

19         A.    Foster.

20         Q.    And who's your uncle?

21         A.    Craig Denton.

22         Q.    What kind of store did you run?

23         A.    It was basically a corner

24   store/clothing store, clothing, apparel.

20

1        Q.    What's the name of the store?

2        A.    It was called Foster's Variety.

3        Q.    And where was it located?

4        A.    3804 Z I N S L E.

5        Q.    What was it?

6        A.    3804 Z I N S L E.

7        Q.    And that's where you live, right?

8        A.    That's across the street.

9        Q.    Oh.

10       A.    Down the street.

11       Q.    It's called Foster's what?

12       A.    Variety and Apparel.

13       Q.    Where is that located, in Kennedy

14   Heights?

15       A.    Yes.  It's no longer in existence.

16       Q.    What period of time did you work

17   there?

18       A.    I worked there from '96, I think it

19   was April of '96 to I think it was September --

20   no, it was somewhere between September and

21   February.

22       Q.    Somewhere between September of '96

23   through February of 1997?

24       A.    Yes.

21

1           Q.    Right?

2           A.    Yes.

3           Q.    Okay.  Did you work there 40 hours a

4    week?

5           A.    Probably more than that.

6           Q.    And how were you paid?

7           A.    I was paid under the table.

8           Q.    Okay.  I mean, would you get paid by

9    the hour?

10          A.    Yeah, basically.

11          Q.    Was there a set amount?  I

12   understand what you're saying when you say under

13   the table, there was no indication you were

14   getting money, but did you have an understanding

15   that you were going to get paid like $5 an hour?

16          A.    It was basically like between 8 and

17   10.

18          Q.    Okay.  And this was cash, right?

19          A.    Yes.

20          Q.    And did you make that much money, 8

21   to $10 and 40 hours a week?

22          A.    Yes.

23          Q.    So it was pretty good money, right?

24          A.    Yeah.

22

1    Q.    Did it go out of business, is that

2  why you left there, or what happened?

3    A.    It went out of business.

4    Q.    Then where did you work?

5    A.    Quaker State/Jiffy Lube.

6    Q.    When did you start working for them?

7    A.    February '98.

8    Q.    Okay.  Until when?

9    A.    Until September, between September

10  5th and 15th of '99.

11    Q.    Now, you said you left Foster's

12  Variety in '97, and you then say you didn't start

13  with Quaker until '98.  Were you out of work for a

14  year?

15    A.    That's the best knowledge that I

16  remember.

17    Q.    So you're out of work for about one

18  year, right, does that sound right?

19    A.    That's the best knowledge of

20  remembering that far back.

21    Q.    How did you support yourself if

22  you're not working?

23        MR. TAMARKIN:  Objection.  You can

24  answer.

23

1          A.    I'm not quite sure on the dates.

2          Q.    Okay.

3          A.    I couldn't tell you.

4          Q.    So what did you do for Quaker State?

5          A.    First I started off at their car

6    wash.

7          Q.    Which Quaker State, by the way?

8          A.    I worked at many of them.

9          Q.    Many of them?

10         A.    Yeah.  I first started on Kenwood

11   Road, Kenwood Road, a block south of Pfeifer.

12         Q.    Okay.

13         A.    At the car wash, running the car

14   wash.

15         Q.    All right.  Then where, what did you

16   do after the car wash?

17         A.    I moved down to their other store,

18   which is Springfield Pike.  They were starting to

19   cut my hours.

20         Q.    Okay.

21         A.    And from being a lube, I was trained

22   as a lube tech and all of that, and then I started

23   running the Springfield Pike store.

24         Q.    Okay.  How long did you work for

24

1   Quaker State?

2       A.    Quaker State, after a year had

3   passed, Quaker State was no longer in existence,

4   Jiffy Lube took over, so they closed the store on

5   Springfield Pike.  They gave us a two-week grace

6   period to either work or take two weeks off.  And

7   then I moved to East Kemper Road store.

8       Q.    Jiffy Lube East Kemper Road?

9       A.    Yes.

10      Q.    Okay.

11      A.    I worked there until they found me a

12  store, and then I moved down to Madisonville, at

13  Madison and Red Bank.

14      Q.    And what period of time are we

15  talking about there now?

16      A.    That was two weeks later after that

17  little -- I didn't take the layoff.

18      Q.    Is that in September of 1999 or --

19      A.    No, that's when I left there.  That

20  was in between -- maybe April, I think they took

21  over in April, April.

22      Q.    So when you say Quaker State, it's

23  Quaker State/Jiffy Lube, and you worked there from

24  February of 1998 through September of '98?

1        A.    'Ninety-nine.

2        Q.    'Ninety-nine.  And which store were

3    you at when you left in September of '99?

4        A.    Madison and Red Bank.

5        Q.    And that was a Jiffy Lube, right?

6        A.    Yes.

7        Q.    Why did you leave?

8        A.    Basically I was working there and I

9    was very more experienced than most of the people

10   that were coming in, and they were getting

11   promotions over me, and when I complained about

12   certain things that was going on that wasn't

13   supposed to be going on, they called me basically

14   an instigator, said I started things, and --

15       Q.    Who called you an instigator and who

16   said you started things?

17       A.    Well, we had -- I had an assistant

18   manager, a manager, a DS, district manager, that

19   come around and checked the stores, and then

20   there's a person over there, so I had to go in

21   chain of command basically.

22       Q.    Who was your immediate supervisor?

23       A.    Tim Sizemore.

24       Q.    And what was his position?

26

1          A.    Manager.

2          Q.    Was he a manager -- you were the

3     manager of the store, right?

4          A.    No.

5          Q.    What was --

6          A.    He was the manager.

7          Q.    What was your position with the

8     Madisonville Jiffy Lube, what was your position?

9          A.    Just a tech.

10         Q.    You were just a technician?

11         A.    Yes.

12         Q.    And you reported to the manager, who

13    was Tim Sizemore, right?

14         A.    Yeah.

15         Q.    And he fired you, right?

16         A.    No.

17         Q.    What did he say to you?

18         A.    He referred -- He called up the

19    district manager and complained to the district

20    manager about many other things, just not what I

21    had complained about.

22         Q.    Who was the district manager?

23         A.    Oh, what was his name -- Ken -- I

24    can't think of his last name.

27

1          Q.    Okay.  And he complained to him that

2    you were an instigator and were a troublemaker; is

3    that right?

4          A.    No, no.

5          Q.    What did he complain --

6          A.    Incorrect.

7          Q.    What did he complain to him?

8          A.    He complained that I was, I was

9    stubborn, I was hard to get a point across to.  So

10   he thought he can get him to get the point across

11   to me.

12         Q.    Tim thought that he could get the

13   regional manager to get the point across to you?

14         A.    Yes.

15         Q.    What's the regional manager's name

16   again?

17         A.    Ken, I don't even remember his last

18   name.

19         Q.    So did Ken come and talk to you?

20         A.    Yes.

21         Q.    What did he tell you?

22         A.    He asked me what was going on, and I

23   told him everything that was going on and I told

24   him all the stuff, I said I'm following all the

28

1    rules, everything.  They complained about me not

2    cleaning the pit.  I was the pit man.  So when the

3    pit man starts, he has to clean up the thing

4    before he leaves.  They said I didn't clean it up.

5    And when I complained about other things that was

6    going on, he said mind your own business.

7        Q.    Ken said mind your own business?

8        A.    Yes.

9        Q.    And what was your response?

10       A.    I didn't have no response to that.

11       Q.    Okay.  Did you continue your

12   employment then with Jiffy Lube?

13       A.    Yes.

14       Q.    And then how was it terminated?

15       A.    Well, it was basically terminated,

16   more and more stuff projected as far as the pit

17   man basically runs everything as far as when a car

18   comes in and everything is set up, they can't do

19   nothing without my say-so, you see what I'm

20   saying, and without me saying something, anybody

21   can get hurt, especially me, I can get hurt

22   faster.  So they were doing things that they

23   weren't supposed to do without clearing with me.

24   They got to clear with me first before they lift a

1    car up or do anything, start a car up, make sure

2    I'm clear from that.  And I got tired of all that

3    stuff, I almost got my hands crushed, I got

4    manifold burns to prove all that stuff.  And after

5    I left there, a whole lot of people got fired.

6           Q.   Well, did you get fired?

7           A.   No.  Basically they wanted me to

8    work out my problem with the manager.  I said I

9    rather go somewhere else.

10           Q.   So you quit voluntarily?

11           A.   Yeah.  I could have, basically I

12   could have talked it out with them, but not for

13   the experience that I got.

14           Q.   You didn't think it was worth it,

15   right?

16           A.   No.

17           Q.   Okay.  So you voluntarily left your

18   employment with Jiffy Lube in September of '99?

19           A.   Yeah.

20           Q.   Then where did you go to work?

21           A.   Columbia Oldsmobile.

22           Q.   And when did you start your work

23   with Columbia Oldsmobile?

24           A.   Less than a week later.

1       Q.    October of '99?

2       A.    No, same month.

3       Q.    September of '99?

4       A.    Yes.

5       Q.    Okay.  Now, was your uncle, Jeff

6  Denton, already working there?

7       A.    Yes.

8       Q.    Did he help find you the job?

9       A.    Yes, he referred me.

10      Q.    So when you left Jiffy Lube, you

11  talked to your uncle, Jeff Denton, and he said why

12  don't you apply at Columbia Oldsmobile?

13      A.    No.

14      Q.    How did it go?

15      A.    He said why don't you come up here,

16  they want to speak with you.

17      Q.    Columbia Oldsmobile?

18      A.    Yes.

19      Q.    And what was your uncle's position

20  with Columbia Oldsmobile?

21      A.    I had no idea at that point.

22      Q.    And what position did you apply for?

23      A.    I basically applied for a lube tech.

24      Q.    Is that the job your uncle was

1   doing?

2          A.   I don't know, I don't know at that

3   time.

4          Q.   Did you get the job as lube tech?

5          A.   No.

6          Q.   What job did you get?

7          A.   Car wash.

8          Q.   And what was the rate of pay?

9          A.   Seven.

10         Q.   Seven dollars an hour?

11         A.   Yes.

12         Q.   And then you worked at Columbia from

13  September of '99 through what time, when were you

14  terminated?

15         A.   I don't remember.

16         Q.   Please?

17         A.   I don't remember.

18         Q.   You don't know the year?

19         A.   2000, I don't know the exact date.

20         Q.   June of 2000?

21         A.   I guess.

22         Q.   So you were at Columbia, September,

23  October, November, December, four plus six, you

24  were there about ten months, right?

32

1        A.    (Nodding head.)

2        Q.    True?

3        A.    True.

4        Q.    Okay.  Then where did you go to

5   work?

6        A.    For my uncle.

7        Q.    Which uncle?

8        A.    O C E A, T U C K E R.  J in the

9   middle.

10       Q.    Middle initial J?

11       A.    Yeah.

12       Q.    So it's Ocea J. Tucker?

13       A.    Yes.

14       Q.    What's he do?

15       A.    He's a detail -- He owns a detail

16   shop.

17       Q.    What's the name of his detail shop?

18       A.    OC's Professional.

19       Q.    Where are they located?

20       A.    At this time it was at Reading Road.

21   It's no longer there.

22       Q.    Where is it now?

23       A.    It's at 112 West Wyoming Avenue.  It

24   was called OC's Professional Auto Polishers.

33

1              MR. TAMARKIN:  Is that in Lockland?

2       A.    Yes.

3       Q.    OC's?

4       A.    Professional Auto Polishers.

5       Q.    Auto Polishers.

6              MR. TAMARKIN:  I know where that

7    is.

8       Q.    You say it's in Lockland?

9       A.    Yes.

10       Q.    And that's where you're working now?

11       A.    No, that's where it is now.  I was

12    working there at the Reading one.

13       Q.    How long did you work there?

14       A.    I only worked there from, until I

15    started at Moser Dodge.  I started at Moser Dodge

16    in September.

17       Q.    You worked there from June of 2000?

18       A.    No, I didn't start until actually

19    July.

20       Q.    July of 2000 until when?

21       A.    Until, Moser Dodge, until August, I

22    worked there like a month.

23       Q.    August of 2000?

24       A.    The end of August.

34

1   Q. What did you make there at OC's?

2   A. I made $10 an hour.

3   Q. Ten dollars an hour?

4   A. Yeah.

5   Q. What were you making when you left

6 Columbia?

7   A. The same as I told you before,

8 seven.

9   Q. Seven dollars an hour?

10   A. Yes.

11   Q. So you left Columbia and you made

12 more by working at OC's, right?

13   A. Yes.

14   Q. You only worked there for about a

15 month, correct, at OC's?

16   A. Yes.

17   Q. Then where did you go to work?

18   A. Moser Dodge.

19   Q. Where are they located?

20   A. On Madison Road.

21   Q. In Cincinnati?

22   A. Yes.

23   Q. What did you do there?

24   A. Lot tech and new car delivery, new

35

1    and used car delivery.

2            Q.    You started there in August of 2000?

3            A.    No, September.

4            Q.    September of 2000.  Until when?

5            A.    February 14th, '01.

6            Q.    Who was your supervisor?

7            A.    Earl Mills.

8            Q.    Earl Minch?

9            A.    Mills.

10           Q.    And what was your rate of pay there?

11           A.    Seven dollars.

12           Q.    Moser Dodge?

13           A.    Yes.

14           Q.    And why did you leave there?

15           A.    Lack of production on cars.  Lack of

16   sales, so they had to cut back and laid me off.

17           Q.    So you were laid off, right?

18           A.    Yes.

19           Q.    Then where did you go to work?

20           A.    Filed for unemployment.

21           Q.    And are you working now?

22           A.    No.

23           Q.    So you've been on unemployment from

24   February of 2002 until the present; is that right?

Spangler Reporting Services, Inc.

PHONE (513) 381-3330    FAX (513) 381-3342

1          A.    2001.

2          Q.    I thought you worked at Moser Dodge

3    from September of 2000 through February 14th,

4    2001?

5          A.    Then I filed for unemployment.

6          Q.    I'm sorry, yeah, unemployment from

7    February 2001 to the present; is that right?

8          A.    Yes.

9          Q.    So you've been on unemployment

10   almost coming up two years, right?

11         A.    Yes.

12         Q.    You can't find any work?

13         A.    No.

14         Q.    You're physically capable of

15   working, correct?

16         A.    Up until, when was it, September I

17   think it was, September or October, when I was in

18   a car accident, I was off for another six months,

19   so I was unable to even move my shoulder or

20   anything.

21         Q.    When were you in a car accident?

22         A.    I think it was September 29th, one

23   of those.

24         Q.    September 29th, what year?

37

1          A.    Last year.

2          Q.    2001?

3          A.    Yeah.

4          Q.    And then you're saying you were

5    physically unable to work for about six months

6    from that date?

7          A.    Yes.

8          Q.    So from September through March of

9    2002 you were unable to work, right?

10         A.    Yes.

11         Q.    Right?

12         A.    Yes.

13         Q.    Okay.  What was your injury in your

14   car accident?

15         A.    What was my injury?  I got

16   rear-ended and it was a neck and shoulder injury.

17         Q.    So then your last employment would

18   have been with Moser Dodge, right?

19         A.    I think I worked for my uncle right

20   before that accident.  And then after that I

21   filed.

22         Q.    Are you presently receiving

23   unemployment?

24         A.    No.  It just ended in June.

38

1        Q.    So you're not getting any benefits;

2   is that right?

3        A.    No.    They told me to try back.

4        Q.    You are physically able to work now,

5   right?

6        A.    Now I am.

7        Q.    And you haven't been able to find a

8   job?

9        A.    Correct.

10  (Defendants' Exhibit No. 1 was marked for

11  identification.)

12        Q.    Let me show you some exhibits here.

13  Exhibit 1, let's see here --

14             MR. TAMARKIN:    If you're going

15  through exhibits, I need copies.

16             MR. LANGENBAHN:    I've got them

17  here.

18             MR. TAMARKIN:    Well, I have to go

19  to the men's room a second.

20             MR. LANGENBAHN:    Okay.

21                              (Brief recess.)

22                    (Mr. Denton left the room.)

23  BY MR. LANGENBAHN:

24        Q.    Sir, let me show you what we've

Spangler Reporting Services, Inc.

PHONE (513) 381-3330    FAX (513) 381-3342

1    marked as Defense Exhibit 1.  Is this a copy of

2    your application for employment with Columbia

3    Oldsmobile?

4              A.    Yes.

5              Q.    And if you go to the second page, is

6    that your signature on the second page?

7              A.    Yes.

8              Q.    Dated October 6, 1999?

9              A.    Yes.

10             Q.    And it gives the information that

11   your current address was 3727 Zinsle Avenue,

12   Cincinnati, Ohio 45213, correct?

13             A.    Correct.

14             Q.    And that your father's -- the person

15   to notify in case of an emergency is Andre Denton,

16   who is your father, correct, and he lives at the

17   same address, right?

18             A.    Yes.

19             Q.    Where does Jeff Denton live, does he

20   live near you?

21             A.    He was living there at that time.

22             Q.    So when you made the application,

23   you lived -- Jeff Denton was living at 3727 Zinsle

24   Avenue also?

1          A.    Yeah, for a short time.

2          Q.    And you still live on 3727 Zinsle

3     Avenue, right?

4          A.    Yes.

5          Q.    You indicated you're applying for

6     the position of oil change/car wash, correct?

7          A.    Yes.

8          Q.    And your salary requirements is 7 to

9     $8, right?

10         A.    Yes.

11         Q.    And you're available at any time,

12    right?

13         A.    Yes.

14         Q.    And you acknowledge that you were

15    not presently employed, right; it says are you now

16    employed, and you marked no, right?

17         A.    Yeah.

18         Q.    And you indicate you attended

19    Woodward High School, right?

20         A.    Yes.

21         Q.    And you also indicated you were a

22    certified lube technician?

23         A.    Yes.

24         Q.    You confirm that you have no

41

1    military service, right?

2              A.    Right.

3              Q.    And your references were Jeffrey

4    Denton, your uncle, right?

5              A.    Yes.

6              Q.    And Michelle Jones, who is your

7    mother?

8              A.    Yes.

9              Q.    Cashier, where was she cashier?

10             A.    Kroger's.

11             Q.    Which Kroger's?

12             A.    Walnut Hills.

13   (Defendants' Exhibits Nos. 2 and 3 were marked for

14   identification.)

15   (Mr. Denton entered the room.)

16             Q.    Exhibit 2, this is a copy of your

17   driver's license and your Social Security card; is

18   that right?

19             A.    Yes.

20             Q.    Columbia Oldsmobile needed that

21   information because you were going to be driving

22   some of their vehicles, right?

23             A.    Yes.

24             Q.    Exhibit 3 is a payroll document

42

1    dated October 5th indicating that you were being

2    hired effective October 5th, 1999 at $7 an hour,

3    correct?

4            A.    Correct.

5            Q.    What was your job?

6            A.    It says car wash.

7            Q.    Car wash, right?

8            A.    That's what it says.

9            Q.    So after a car was serviced, you

10   would then wash the car; is that right?

11           A.    Yes.

12           Q.    Did Columbia have other car washers?

13           A.    Yes.

14           Q.    Who were the other car washers?

15           A.    Gary Uhlfelder, then there were two

16   detail men.

17           Q.    Who were the detail people?

18           A.    Eddie Berkley and Eric.

19           Q.    When you say detail, what would they

20   do?

21           A.    They get cars ready to put on

22   display like for new cars going out or in the

23   front office.

24           Q.    So they would polish them up real

43

1    good; is that right?

2         A.    Yes.

3    (Defendants' Exhibit No. 4 was marked for

4    identification.)

5         Q.    I'm going to show you Exhibit 4.

6    Were you terminated on February 24, 2000?

7         A.    Yes, I guess so.  It says here

8    terminated.

9              MR. TAMARKIN:  Well --

10        Q.    Do you know why you were terminated?

11             MR. TAMARKIN:  What did I tell you,

12   if you don't know -- if you know, if you remember

13   that, that's fine, don't guess.

14        A.    No.

15        Q.    The question I had for you was do

16   you recall that you were terminated on February

17   24th of 2000?

18        A.    Yes.

19        Q.    Can you tell me why you were

20   terminated at that time?

21        A.    I don't know.

22        Q.    Do you recall getting involved in an

23   incident with Bob Branigan in the front area of

24   the Service Department?

Spangler Reporting Services, Inc.

PHONE (513) 381-3330    FAX (513) 381-3342

1        A.    Bob was not there.

2        Q.    Who was there?

3        A.    Service writers, dispatch, dispatch

4   guy, and the mechanics and my uncle.

5        Q.    Uncle being Jeff Denton; is that

6   right?

7        A.    Yes.

8        Q.    Were you threatening Scott Dick at

9   that time, Scott Dick?

10       A.    No.

11       Q.    Were you making some threats to a

12   Rob Krista, K R I S T A?

13       A.    I don't know Rob.

14       Q.    Okay.  Was there an incident up

15   front where you were saying motherfucker and a lot

16   of cussing going on?

17       A.    That was second round.

18       Q.    Second round, what do you mean

19   second round?

20       A.    Second termination.

21       Q.    Okay.  The second termination

22   occurred June 26th, 2000, right, true?

23       A.    What?

24       Q.    The second termination occurred June

52

1      Q.   Is that right?

2      A.   Yes.

3      Q.   Okay.  So what was discussed at this

4  meeting when you saw this document, Exhibit 6?

5      A.   What was discussed, they wanted to

6  know what I said about Mr. Joseph and Karl Stewart

7  and Bob Branigan.

8      Q.   Okay.  What did you say, what did

9  you tell them that you said about Mr. Joseph?  You

10 can't remember?

11     A.   I said I don't know him, I can't say

12 nothing about him.

13     Q.   What did you tell them you said

14 about Karl Stewart?

15     A.   I said that he's, he supposedly is

16 looking out for us, but he let this fuck boy do

17 whatever he wants.

18     Q.   Okay.  So you said Mr. Stewart is

19 supposed to be looking out for us; who did you

20 mean when you said "us"?

21     A.   Everyone in the shop.

22     Q.   But he's letting fuck boy get away

23 with everything?

24     A.   Yes.

Spangler Reporting Services, Inc.

PHONE (513) 381-3330   FAX (513) 381-3342

53

1          Q.    Now, when you said "fuck boy" to

2    Mr. Stewart, did he know who fuck boy --

3          A.    Yeah, he knew who fuck boy was.

4          Q.    Okay.  What did Mr. Stewart say

5    relative to your statement about, your statement

6    about Mr. Stewart you're supposed to be looking

7    out for us but you're letting fuck boy get away

8    with everything?

9          A.    He just looked at me and started

10    laughing.

11          Q.    He didn't respond?

12          A.    He laughed first.

13          Q.    He laughed first, then what did he

14    say?

15          A.    Then he looked at Bob and said who's

16    fuck boy, and he said that's a name that they call

17    Gary back in the shop.

18          Q.    Then what did Karl say?

19          A.    Karl was like, okay, next thing, he

20    went on to the next one, what did you say about

21    Jim.  I said Jim claims to be doing so much work,

22    I never see him, he's always on vacation, and then

23    he comes back trying to run his mouth.

24          Q.    Okay.  What did Jim Peters or Karl

54

1    Stewart say about that?

2         A.    They just tried to say that I said

3    something different.

4         Q.    And then what about Bob Branigan,

5    what did you say about him?

6         A.    I said Bob Branigan sat there the

7    whole time every time I complained, and I said it

8    seems like he's your fuck boy too.

9         Q.    Now, this is in front of all these

10   people, right?

11        A.    Yeah.

12        Q.    Who are your supervisors and

13   superiors, right?

14        A.    No, supervisors.

15        Q.    They're your superiors too, right?

16             MR. TAMARKIN:   Objection.

17        A.    Supervisors.

18        Q.    Why aren't they your superiors?

19             MR. TAMARKIN:   Objection.   You

20   don't have to answer that.

21        Q.    They're your supervisors, right?

22        A.    Correct.

23        Q.    You knew they had the right to fire

24   you, right?

55

1          A.    Correct.

2          Q.    And you're calling them fuck boy?

3          A.    No.

4          Q.    You called Bob Branigan fuck boy,

5    right?

6          A.    Yes.

7          Q.    And you knew that Bob Branigan had a

8    right to fire you, right?

9          A.    No.

10         Q.    Well, he had already fired you

11   before, he had already fired you before March

12   16th, 2000, hadn't he?

13         A.    Yeah, that's when Karl Stewart

14   intervened.  He did like this (indicating) and

15   ripped it and said we're not going with this and

16   just threw it up in the air.  He said you should

17   have talked to me first.

18         Q.    Telling that to Bob Branigan?

19         A.    Yes.  And then he pointed at this,

20   Bob, like this, and said don't get so emotional

21   behind this.

22         Q.    And these conversations all occurred

23   when you saw this letter of March 16, 2000, right?

24         A.    Yes.

58

1          A.    Huh-uh.

2          Q.    Do you think maybe calling somebody

3     a fuck boy might be causing trouble?

4                MR. TAMARKIN:    Objection.    It's

5     argumentative.

6          Q.    Huh?

7          A.    No.

8          Q.    Then what happened on June 26th that

9     led to your termination, what happened?

10         A.    I don't know, I thought it was a

11    different day.

12         Q.    Let's take a look at Exhibit 7.

13    (Defendants' Exhibit No. 7 was marked for

14    identification.)

15         Q.    It says you're being terminated as

16    of June 26, 2000 for your continual harassment and

17    threatening of fellow employees.  Did you ever get

18    this document?

19         A.    It was sitting on the table.

20         Q.    So this is the same thing, you had a

21    meeting in Karl Stewart's office and this document

22    was sitting on the table?

23         A.    No.

24         Q.    No what?

65

1          Q.    What events precipitated this, the

2   fact that you were terminated on June 26, 2000?

3          A.    I don't understand what -- What you

4   mean by that?

5          Q.    Well, did Columbia Oldsmobile have a

6   reason for terminating you on June 26, 2000?

7          A.    Everybody has a reason, but I don't

8   think it was a just reason.

9          Q.    Okay.  What was the reason that you

10  understood, whether it was just or unjust, that

11  Columbia Oldsmobile had to terminate you on June

12  26, 2000?

13         A.    That's the second time, right?

14         Q.    Second time.

15         A.    Well, they said, they asked me about

16  the fuck boy thing, but they also tried to tell me

17  it was for threatening someone with a golf club

18  and a gun, a baseball bat and a chain, all at the

19  same time.  I don't think I can carry all that.

20  (Mr. Denton entered the room.)

21         Q.    Where did this conversation occur

22  that you learned the reasons why Columbia

23  Oldsmobile --

24         A.    Right before I told them I don't

1    sign shit but my check.

2              Q.    So this was in Karl Stewart's

3    office, correct?

4              A.    Yes.

5              MR. TAMARKIN:    When you can break,

6    it's five after.

7              Q.    Karl Stewart and Jim Peters were

8    present, right?

9              A.    Yes.

10             Q.    They then told you the reason why

11   you were being terminated, correct?

12             A.    Yes.

13             Q.    And what was the reason that they

14   gave you?

15             A.    They said that I chased someone

16   through the shop with a baseball bat, a chain, a

17   knife, a throwaway pistol, and a golf club.

18             Q.    And did that happen?

19             A.    No.

20             Q.    Did any of it happen?

21             A.    Did any of what happen?

22             Q.    Any of the allegations that you

23   chased somebody through the shop with any of the

24   items.

59

1        A.    No, that's not what happened.

2        Q.    Tell me what happened.

3        A.    This was the second time.

4        Q.    Right.

5        A.    I was doing all my work, getting

6    ready to go on lunch, and I was waiting for Gary

7    to come back, and it was like three hours later

8    and then Jim comes in and says come with me,

9    young'un.

10       Q.    Who said that?

11       A.    Jim Peters.

12       Q.    Said come with me, young'un?

13       A.    Yeah.  And then this was sitting on

14   the thing already with a carbon copy and he pushed

15   it forward like that.  And I looked at it and he

16   said you agree with this and sign this.  I told

17   him I don't sign shit but my check.

18       Q.    You don't sign shit with your check?

19       A.    But my check.

20       Q.    Oh, you don't sign shit but your

21   check?

22       A.    Yeah.

23       Q.    He wanted you to sign Exhibit 7 is

24   what you're saying?

1          Q.    And Jim Peters did the talking; is

2    that right?

3          A.    Both of them.

4          Q.    Okay.  But Jim Peters is the one

5    that wanted you to sign Exhibit 7; is that right?

6          A.    Incorrect.

7          Q.    Karl Stewart wanted you to sign

8    Exhibit 7?

9          A.    Correct.

10         Q.    And you said I don't sign shit but

11   my check?

12         A.    Yeah.

13         Q.    And then did they ask you to leave?

14         A.    No.  I got up and stepped out.  I

15   got up and walked out.

16         Q.    Did you understand that you had been

17   terminated?

18         A.    No.

19         Q.    Can you read this letter for me?

20         A.    "You are being terminated as of June

21   26, 2000 for your continual harassment and

22   threatening of fellow employees."

23         Q.    All right.  Did you understand that

24   Exhibit 7 meant that you were being terminated at

Spangler Reporting Services, Inc.

PHONE (513) 381-3330    FAX (513) 381-3342