**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF OHIO
 3                   WESTERN DIVISION
 4
 5
 6    ---------------------------------------
                                          :
 7    JEFFREY DENTON, et al.,             :
                                          :
 8         Plaintiffs,                    :
                                          :
 9      vs.                               :     CASE NO.
                                          :     C-1-02-422
10    COLUMBIA MOTORS, INC.,              :
                                          :
11         Defendant.                     :
                                          :
12    ---------------------------------------
13
14
              Deposition of:   JEFFREY DENTON
15
              Taken:           By the Defendant
16
17            Pursuant to:     Agreement
18            Date:            December 26, 2002
19            Time:            Commencing at 1:38 p.m.
20
              Place:           830 Main Street
21                             Suite 999
                               Cincinnati, Ohio  45202
22
              Before:          S. Diane Farrell, RMR
23                             Notary Public - State of Ohio
24
```

COPY

Page 50

1    Q.   Okay.  Now, your application now mentions
2  Roadway Express?
3    A.   Yes.
4    Q.   And we never talked about them, right?
5    A.   Okay.
6    Q.   True?
7    A.   True.
8    Q.   Okay.
9    A.   I've done had several jobs.  I'm 40 years old.
10  I missed some.  There's a couple more we probably missed.
11    Q.   Okay.  So you worked at Roadway Express in
12  Tri-County, right?
13    A.   Yes.
14    Q.   And it says $17 per hour, is that right?
15    A.   Yes.
16    Q.   And Mark Brooks was your supervisor?
17    A.   Yes.
18    Q.   And your position was service technician,
19  right?
20    A.   Service technician, trailer line hookups and
21  brakes and winterizing, oil changes.  The truckers went on
22  strike and got the white collar workers.  Then it got the
23  technicians.
24    Q.   What's LOF stand for there?

Page 51

1    A.   Lube, oil, and fitter.
2    Q.   So you did lube, oil, and filter work for
3  Roadway Express, right?
4    A.   Yeah.  Reason for leaving, trucker strike.
5    Q.   And that's the reason, right?
6    A.   Yes, the truckers' strike.
7    Q.   You said initially they took the white collar
8  jobs?
9    A.   White collar workers, figure of speech.  The
10  people up in the front office, white collar workers.
11    Q.   Okay.  Then the next employer?
12    A.   Firestone Rubber Company, Northland Boulevard.
13    Q.   What was the rate of pay?
14    A.   9.50.  I think when I left there I was at
15  12.50.  All duties performed at Firestone, tires,
16  brakes --
17    MR. TAMARKIN:  Just answer his questions.
18    THE WITNESS:  I just didn't think it was
19  legible to him.
20    MR. TAMARKIN:  If he asks you the question, you
21  can answer.
22    THE WITNESS:  All right.
23    Q.   So you performed all duties there, right?
24    A.   Absolutely.

Page 52

1    Q.   What were the duties?  It says here --
2    THE WITNESS:  See.
3    MR. TAMARKIN:  Well, that's all right.
4    A.   All duties performed, tires, tune-ups, brakes,
5  shocks, struts, air conditioning service, 7500-mile
6  service, 15,000, 1,000-mile service, 30,000-mile service,
7  et cetera.
8    Q.   And what was the period of time you worked for
9  Firestone you listed on here?
10    A.   It has '89 to 10/93.  That doesn't -- I wrote
11  it.  It doesn't even look legible.
12    Q.   Okay.  Does it indicate a reason for leaving?
13    A.   No, it doesn't.
14    Q.   Okay.  And what was the reason you gave me for
15  leaving earlier?
16    A.   A better job.  I'm always looking to better
17  myself.
18    Q.   What was the job you got into a fight with?
19  What job was that?
20    A.   Bob Williams.  It wasn't a fight.  I wouldn't
21  say it was a fight.  You're saying it was a fight.  I was
22  struck and --
23    Q.   A guy at Bob Williams hit you, you hit him
24  back, and Mr. Pierson told you that --

Page 53

1    A.   Three days later both of us went in the office,
2  which he apologized.  And the apology didn't make any
3  difference.  We both went against company policy and we
4  both were terminated.
5    Q.   Right.  You were terminated from Bob Williams
6  Ford, correct?
7    A.   We both were terminated.
8    Q.   All right.  So the statement on this form under
9  Bob Williams Ford, reason for leaving, found better job,
10  that's a lie, correct?
11    A.   I found a better job.  I don't think it is.
12    Q.   Well, would not it be the correct statement the
13  reason for leaving is that you were terminated for fighting
14  on the job?
15    A.   I found a better job.  I -- when he struck me,
16  I was not terminated.  I was -- actually three days later,
17  he terminated me.  But I found me a job going out the door.
18    Q.   All right.  And it's not your position that the
19  reason for leaving Bob Williams Ford is, in fact, that you
20  were fighting on the job with another employee?
21    A.   No, I found a better job.  I was unhappy there
22  before I was struck.
23    Q.   Do you think that's being accurate and telling
24  the truth?

14 (Pages 50 to 53)

Page 70

1    Q.   Okay.  And as far as what he was hired, what
2  position, you don't know what position he was hired?
3    A.   I know that he was promised to be advanced, but
4  he was hired as a car washer.  But he was promised to be
5  advanced as soon as one was available.  And it never
6  happened.
7    Q.   Promised to be advanced to what?
8    A.   A technician, the job that he had before --
9  before he came to Columbia Oldsmobile.
10   Q.   And as far as you know, then, Andre was a car
11 washer his entire time that he was there?
12   A.   Yes, as far as I know.
13   Q.   And I've got that period of time as October
14 5th, '99, to June 26th, 2000, so it would be about eight
15 months.  Does that sound right?
16   A.   I don't know.  I don't know.  I was more
17 concerned about myself.
18   Q.   Okay.
19   A.   I wasn't looking at his job career.
20   Q.   All right.  Prior to Andre's being employed by
21 Columbia Oldsmobile in October of '99, did you have any
22 problem with fellow workers at Columbia as of yet?
23   A.   None whatsoever.
24   Q.   No problems?

Page 71

1    A.   None whatsoever.  And there was always pranks
2  going on.
3    Q.   Always what?
4    A.   I should just say no.
5    Q.   Always what?
6    A.   No, I don't have any problems.
7    Q.   What was the word you said?
8    A.   Pranks.  Pranks.
9    Q.   Oh, there was always pranks going on?
10   A.   Yes, that I visualized with Rocky.  They
11 would -- pranks on Richard Fredericks.
12   Q.   Okay.  So prior to Andre being hired, you
13 didn't have any problems with the employees at Columbia
14 Oldsmobile?
15   A.   No.
16   Q.   Okay.
17   A.   They didn't know me.
18   Q.   But you did observe that pranks were going on?
19   A.   Yeah.
20   Q.   And those pranks involved Richard Fredericks?
21   A.   The majority of them.
22   Q.   And what were the pranks -- can you tell me
23 what pranks you were talking about?
24   A.   They would dump trash out.  He was a janitor.

Page 72

1  They would dump trash out for him to clean up and just make
2  his job a little more hectic than it already was, put
3  stickers on the back of him, kick me, I'm stupid, just
4  disrespectful things.
5    Q.   And who was doing these things to him?
6    A.   Same people.
7    Q.   Same people?
8    A.   Mark Fry.  What are their names?
9    Q.   Jeff Watts?
10   A.   Jeff Watts.  You know them.
11   Q.   Carey?
12   A.   Tom Carey.  Names I just don't want to
13 remember.
14   Q.   Okay.  Anybody else.  Mark Fry, Jeff Watts, Tom
15 Carey.
16   A.   Scott Dick.
17   Q.   Scott Dick?
18   A.   Harry.  I don't know Harry's last name.
19   Q.   Okay.  And generally --
20   A.   Mischief things.
21   Q.   When we talk about these pranks or mischief
22 things, it involved these people, Mark Fry, Jeff Watts, Tom
23 Carey, Scott Dick and Harry, right?
24   A.   Yes.

Page 73

1    Q.   Isn't there two -- who are the two brothers?
2    A.   Jason and Scott.  I can't recall all these
3  individuals.  I lived a nightmare in this.
4    Q.   Okay.  Now, when you saw them do these things,
5  mischievous things to Richard Frederick, did you tell them
6  about it, that they shouldn't be doing it?
7    A.   And gradually that's how they -- yes, yes.
8    Q.   So you said, you shouldn't be doing these
9  things?
10   A.   Yes.
11   Q.   And you told -- you told to Mark Fry, Jeff
12 Watts, Tom Carey, Scott Dick or Jason Dick, right?
13   A.   No.
14   Q.   Who did you tell?
15   A.   I told Bob Branigan and Jim Peters.
16   Q.   Okay.  So you told them?
17   A.   I snitched on them.  I snitched on them, which
18 I didn't have a problem with them.  I snitched, and that's
19 probably where my problem started.
20   Q.   So you told Bob Branigan and Jim Peters that
21 these mischievous things were going on and you didn't
22 necessarily agree with them and didn't think they were
23 warranted, right?
24   A.   Absolutely.

19 (Pages 70 to 73)

**Page 74**

1    Q.   And what was Bob Branigan and Jim Peters'
2  response?
3    A.   They've been -- they've -- Rocky likes it.
4  They've been doing it all the time to Rocky, it's no big
5  deal.
6    Q.   Okay.  And how many times can you recall that
7  you complained to Jim Peters and to Bob Branigan?
8    A.   During my career there, I can't count them.
9  There was several.
10    Q.   Okay.
11    A.   I can't count them.
12    Q.   But your position would be that you complained
13  to them a number of times, correct?
14    A.   Daily.  On a daily basis.
15    Q.   And that would all be before anything ever
16  occurred to you, is that right?
17    MR. TAMARKIN:  Objection.  That isn't what he
18  testified to.
19    Q.   Yeah, that isn't what you testified to.  Let me
20  ask you this way.  How many times did you complain to Bob
21  Branigan and/or Jim Peters before anything occurred to you?
22    A.   Well, I was -- I was a new employee, and it was
23  kind of strange that they were doing this to this
24  individual and getting away with it.  I complained.  It

**Page 75**

1  wasn't very many times.  But I made it aware that I was
2  aware of what they were doing to Mr. Fredericks, and it's
3  just nonsense.  It just seemed like it should stop or be
4  addressed.  And the answer to your question, a couple of
5  times.  And then I left it alone.
6    Q.   Okay.  Now, can you tell me when is the first
7  incident that occurred involving mischievous -- or mischief
8  or a prank against you?
9    A.   No, I can't tell you when.
10    Q.   Okay.  When do you believe it first started
11  that you were being harassed by employees at Columbia
12  Oldsmobile?
13    A.   When do I believe?  It was before my nephew
14  came on.
15    Q.   And what -- what happened for you to believe
16  that you were being harassed by employees at Columbia
17  Oldsmobile?
18    A.   Actually, Scott Dick informed me that I'm
19  actually a pushover, they treat you the way they do because
20  you don't do anything.  So you know, putting -- knocking my
21  pop over, sticking their foot out to trip me.  You know,
22  I'm an adult.  It's childish pranks.  And they just
23  induced -- as I let small ones go, they induced and got
24  bigger.

**Page 76**

1    Q.   Okay.  So Scott Dick sort of warned you or said
2  that you're a pushover, they do the things they do because
3  they know they can get away with it?
4    A.   Because you don't do anything, correct.
5    Q.   Now, what was he referring to, what things?
6    A.   Just what I told you about, childish pranks,
7  put their foot out to trip me or put a water bomb behind my
8  toolbox and make it explode.  I wouldn't go to Bob Branigan
9  for that.  I would continue to work.  And I guess everybody
10  else caught on to it, and Jeffrey Denton's a pushover, so
11  that's what they did.
12    Q.   Put a foot out to trip you.  Like you'd be
13  walking down the aisleway --
14    A.   Like you not be walking, like you walk down the
15  aisle.
16    Q.   Say that again.
17    A.   Walk, walk, walking, showing action.  I would
18  walk down the aisle.  I would walk down the aisleway.
19    Q.   And somebody would stick their foot out?
20    A.   Yes.
21    Q.   Who would that somebody be?
22    A.   Mark Fry and Jeff Watts and Tom Carey, the
23  pranksters.
24    Q.   Were you ever tripped?

**Page 77**

1    A.   Sure.
2    Q.   So you were tripped and you fell?
3    A.   I was tripped, and I was -- I had to catch my
4  balance.  I probably didn't fall.
5    Q.   When that happened, you didn't go to Bob
6  Branigan and Jim Peters and complain?
7    A.   Several times.
8    Q.   Oh, you did?
9    A.   When it started happening to me.  When the
10  pranks started escalating, I reported them.
11    Q.   To?
12    A.   My supervisor.
13    Q.   Who first?
14    A.   Bob Branigan, Jim Pierson -- Jim Peters when he
15  was available.
16    Q.   It sounds to me like you weren't getting any
17  satisfaction.  Did you --
18    A.   Absolutely.
19    Q.   -- feel like you needed to go somewhere else?
20    A.   Yes.
21    Q.   Did you go somewhere else?
22    A.   Eventually, yes.
23    Q.   Who'd you go to?
24    A.   EEOC.

**20 (Pages 74 to 77)**

Page 95

1      MR. TAMARKIN: Don't guess if you don't know.
2      A.   I don't know.
3      Q.   Okay. Your requirement -- you felt you should
4   be paid $13 an hour; isn't that right?
5      MR. TAMARKIN: If you know.
6      A.   I felt like I should have been paid more.
7      Q.   Okay. Were you willing to take the reduction
8   in pay, going from Camargo Cadillac at $14 an hour to $10
9   an hour at Columbia Oldsmobile?
10     A.   I did take the reduction.
11     Q.   So you accepted that; is that correct?
12     A.   I worked at Columbia Oldsmobile. I would say
13  yes.
14     Q.   At $10 an hour?
15     A.   Yeah.
16     Q.   You don't understand the reason for the
17  reduction in pay is because you were being paid as a lube
18  technician?
19     A.   No, I don't understand it.
20     MR. TAMARKIN: That's argumentative. I move to
21  strike it.
22     A.   No, I don't understand it.
23     Q.   Sir, I've taken a deposition of Mr. Tucker. He
24  gave me a list of instances that he says involved

Page 96

1   discriminatory matters involving him and yourself. I
2   haven't asked you about what your claims are. You have
3   discriminatory issues.
4      I want you to give me a list of each
5   discriminatory instance that you say was committed by
6   Columbia Oldsmobile or representatives of Columbia
7   Oldsmobile.
8      A.   Okay. The ones that are vivid in my mind is
9   the carbon monoxide.
10     Q.   No, no, slow down.
11     A.   I'll give you time to write.
12     Q.   Okay. That incident occurred on February 2nd,
13  2000?
14     A.   Around there.
15     Q.   Well, just so you understand it, to help you in
16  this time frame, you were first hired by Camargo on March
17  22, 1999. You then went to work at Columbia Oldsmobile on
18  April 30, 1999. So you went to work there four years ago
19  today. Okay.
20     Andre was hired by Columbia Oldsmobile October
21  5, 1999. The incident involving the carbon monoxide
22  occurred on February 22, 2000.
23     MR. TAMARKIN: Are you testifying?
24     MR. LANGENBAHN: No. I'm trying to give him

Page 97

1   some background.
2      Q.   Then you are terminated from Columbia
3   Oldsmobile on November 27, 2000. Okay?
4      MR. TAMARKIN: Assuming all those dates are
5   true.
6      MR. LANGENBAHN: Got that.
7      MR. TAMARKIN: We'll make an assumption all
8   those dates are true.
9      Q.   So do you agree with me the incident involving
10  carbon monoxide occurred February 22, 2000?
11     MR. TAMARKIN: Objection. He said about that
12  time. If he doesn't know, that's not going to help
13  him. He's not contesting the date, he's just not
14  sure. He's not going to testify because you say so.
15     Q.   Now, what other instances --
16     A.   My shoes were lit on fire while I was at
17  Camargo Oldsmobile. Lithium grease put on the floor.
18     Q.   Wait a second, hold on. Shoes lit on
19  fire?
20     A.   Yeah, fire.
21     Q.   How were they lit on fire?
22     A.   With a chemical.
23     Q.   What chemical?
24     A.   I don't know. It was in the dark.

Page 98

1      Q.   You were what?
2      A.   I don't know what they were lit with. I assume
3   that it was brake cleaner or some kind of chemical. I'm a
4   technician, not a chemist.
5      MR. TAMARKIN: Just answer the questions.
6      Q.   And how many times did that occur?
7      A.   That my shoes were lit on fire?
8      Q.   Right.
9      A.   Two times. That's two too many.
10     MR. TAMARKIN: Just answer the questions.
11     Q.   Okay. While you're sitting on the commode; is
12  that right?
13     A.   One of the times, yeah.
14     Q.   So one of the times is while you're sitting on
15  the commode. What's the other time?
16     A.   They were -- just came up to me and sprayed
17  them with a chemical. Backwards, turned, sprayed my shoes.
18     Q.   When they sprayed your shoes, then what
19  happens?
20     A.   They lit them.
21     Q.   Lit them with a match?
22     A.   With fire. I don't know if it was a match or a
23  lighter. With fire.
24     Q.   Okay. Now, this first time on the commode,

5 (Pages 95 to 98)

Page 99

1  when did that happen?
2      A.  I don't know.  When I was working at Columbia
3  Oldsmobile.  When I was using the restroom, that's when it
4  happened.
5      Q.  Who sprayed this chemical on you relative to
6  the commode incident?
7      A.  Mark Frye.
8      Q.  Anybody else?
9      A.  It was a party.  I mean they didn't go down
10 there together to spray them.  Mark Frye and Jeff Watts
11 were together.  I don't know if one lit it and transferred
12 the fire but, I mean, they were a party.
13     Q.  What happened when that incident happened?
14 What happened to you when that incident happened?
15     A.  My shoes caught on fire.  I put them out.
16 Complained to management.
17     Q.  Who did you complain to?
18     A.  My superiors or my boss.  I don't like the word
19 superior.  My boss.
20     Q.  Who was your boss?
21     A.  Bob Branigan.  Jim Peters, I could never find
22 him.
23     Q.  Who did you specifically complain to?
24     A.  Bob Branigan.

Page 100

1      Q.  So you went to Bob Branigan.  What did you tell
2  Bob Branigan?
3      A.  What I just told you.
4      Q.  I want to know what you told Bob Branigan.
5      A.  I told him my shoes were set on fire, they're
6  trying to burn me.
7      Q.  You said "they."  Who was they?
8      A.  I just told you, Mark Frye, Jeff Watts.
9      Q.  And what was Bob Branigan's response?
10     A.  He would take care of it.
11     Q.  He would take care of it?
12     A.  In a humorous manner.  I mean, he really didn't
13 show concern.  He would take care of it, get back to work.
14 Basically he didn't ask me, was I all right.
15     Q.  Did he ask you if you had anything damaged?
16     A.  No.
17     Q.  Did you have anything damaged?
18     A.  Not at that time.  I put the fire out.
19     Q.  So your shoes weren't damaged?
20     A.  Was I damaged or are you talking about the
21 material?  Yeah, my shoes were damaged, yeah.
22     Q.  Did you have to replace them?
23     A.  Eventually.
24     Q.  Well, did you have to replace them because they

Page 101

1  were damaged by this fire?
2      A.  I really can't say that the fire damaged them.
3  I mean, I work in a garage with grease, you know.
4      Q.  The normal wear and tear damaged them?
5      A.  I don't understand the question.
6      Q.  Okay.  Did you suffer any personal injury as a
7  result of that incident?
8      A.  A result of that incident?
9      Q.  Yes.
10     A.  Paranoia.  I mean, I didn't like really coming
11 there, you know, because I knew incidents like that would
12 happen.
13     Q.  Did you go to the hospital relative to that
14 incident?
15     A.  No.  I was instructed to go back to work.
16     Q.  Was there any write-up relative to that
17 incident?
18     A.  I don't know.
19     Q.  Did you insist on a write-up?
20         MR. TAMARKIN:  Objection.
21         MR. LANGENBAHN:  Please?
22         MR. TAMARKIN:  I objected.  You can answer.
23     A.  All the time.  I got several write-ups.  I
24 didn't know what write-ups meant.  I was getting write-ups

Page 102

1  every day.
2          So I just wanted my boss to do something.  I
3  mean, a write-up, I got them every day.
4      Q.  Write-ups are called disciplinary reports,
5  right?  Isn't that what they're called?
6      A.  I don't know what they're called.  So
7  write-up —
8      Q.  This happened before you started getting any
9  disciplinary reports?
10     A.  No.
11     Q.  When did it happen?
12     A.  When did the — I just told you I didn't know
13 when the fire incident happened.  I said, when I was using
14 the restroom.  I don't know when it happened.
15     Q.  Okay.
16     A.  Told you how many times it happened but —
17     Q.  Twice?
18         MR. TAMARKIN:  Just answer the questions.
19     Q.  The second incident that you referred to, where
20 somebody just came up —
21     A.  Mark Frye, Jeff Watts.
22     Q.  It was Mark Frye and Jeff Watts?
23     A.  Yeah.
24     Q.  The second incident occurred before or after

6 (Pages 99 to 102)

Page 119

1    Q.    Why was he tied to a tree in the parking lot?
2    A.    He was being hung. And hung — I seen this
3  dummy tied to a tree and I seen him dragged through the
4  shop, you know, and got my attention on those — on that
5  event, also.
6          If this is the dummy — this is a pretty big
7  dummy. So this might be him that they hung on the tree and
8  dragged through the shop.
9    Q.    I thought they burned these dummies?
10   A.    Okay, I said on three incidences, about three,
11 they burned them.
12   Q.    Did they make another dummy?
13   A.    I'm not saying they made -- these were Barbies
14 that they set on fire, or 12-inch as you say —
15   Q.    12-inch dolls that were set on fire?
16   A.    Yeah. And this dummy is pretty big, wouldn't
17 you say? He was dragged through the shop.
18   Q.    The bigger dummies weren't set on fire?
19   A.    He was hung.
20   Q.    Well, were the bigger dummies not set on fire?
21   A.    No, I believe Bob Branigan would have had issue
22 with the fire marshal if they would have lit that
23 individual up. That's --
24   Q.    Are you saying Bob Branigan was familiar with

Page 120

1  the dummy that's shown in this photograph?
2    A.    I think he was.
3    Q.    And how was he familiar with that?
4    A.    Because he — him and Mr. Peters actually
5  congregated around Jeff Frye and Mark Watts' (sic) toolbox
6  while they made little pranks up.
7    Q.    When you say "pranks," talking about dummies?
8    A.    Okay, well, I mean, this is a prank also,
9  wouldn't you say?
10   Q.    Are you saying that Jim Peters and Bob Branigan
11 congregated around Mark Frye's.
12   A.    I'm not saying --
13   Q.    — work area and saw them making these dummies?
14   A.    I didn't say I saw them making them.
15   Q.    Okay. Then how did they have knowledge —
16   A.    I'm saying certain pranks that went on where
17 they were there -- when the 12-inch Barbie doll was lit, I
18 think I just went over that, Mr. Branigan was standing by
19 me when he was being extinguished. I think I said that.
20   Q.    What's the next incident that you say occurred?
21   A.    Well, I'm not sayin in order. Incidents --
22   Q.    I understand.
23   A.    -- that happened to me. I don't — as far
24 as -- there were water bombs put behind my toolbox,

Page 121

1  compressed with air, they exploded. Continue?
2    Q.    No.
3    A.    Okay.
4    Q.    Now, what's a water bomb? I'm not sure what it
5  is.
6    A.    It's a plastic container that you fill it half
7  mass up with water and put air holes behind it and the
8  compressed air, I mean once it fills up, its volume, it's
9  going to explode.
10   Q.    How does it explode?
11   A.    You fill it up with water halfway and you take
12 the container where there can be air leakage in it and you
13 stick a hose in there and then — you stick the hose in
14 there and turn the air on and eventually it will explode.
15   Q.    So you're saying once you put the hose in with
16 the air, that hose is continuously connected with the
17 bottle and the air is pumped in, pumped in, pump it until
18 it --
19   A.    The way you're pumping like that -- it's a
20 compressor outside, probably as big as the building, and it
21 pumps air continuously. That's how we take tires off and
22 do our --
23   Q.    Eventually it fills up with too much air and it
24 explodes; is that right?

Page 122

1    A.    Absolutely.
2    Q.    Okay. But there has to be this continuous
3  connection and continuous air --
4    A.    The hose.
5    Q.    Of air being put in?
6    A.    Hose. Hose. Air compressed hose that runs air
7  tools.
8    Q.    How did that surprise you, whatever?
9    A.    Because I'm not — I work, I'm not -- I'm not
10 working at a mine or nothing. Explosions.
11   Q.    So you're working in your work area, someone
12 unbeknownst to you --
13   A.    I know who did it.
14   Q.    Well, someone comes along and puts this
15 container there with the air hose attached, and then, as
16 that air continues to go into that container, eventually it
17 explodes?
18   A.    Yes.
19   Q.    And how long does it take?
20   A.    It depends on how big the container is.
21   Q.    Once he sets it there --
22   A.    Well, he doesn't set it there to -- to -- on
23 these occasions he doesn't want my attention.
24   Q.    Right. I know that. He wants to set it there

11 (Pages 119 to 122)

1 and leave and then eventually there's going to be too much
2 air in this container and it's going to explode, right?
3     A.  Yes.
4     Q.  One time you saw the person set it there,
5 right?
6     A.  No, I never saw them set it there. I know who
7 did it.
8     Q.  Who did it?
9     A.  Mark Frye, Jeff Watts, Tom Carey, same guys
10 that did -- did all the things to me, other incidents.
11     Q.  How do you know these individuals did --
12     A.  Because when the explosion was there they
13 wasn't surprised. They weren't surprised. They found it
14 humorous and funny. And actually on one of these
15 incidents, if I'm --
16        MR. TAMARKIN: All right.
17     A.  On one of these explosion incidents it startled
18 Mr. Peters and he came out of his shop, out of his office.
19     Q.  But you're telling me you have no eyewitness
20 contact to say that Mark Frye, Jeff Watts and Tom Carey or
21 Scott Dick did it, correct?
22     A.  Sure.
23     Q.  Sure what?
24     A.  Sure I do.

1     Q.  And how is that?
2     A.  How is that that I don't have any eyewitnesses?
3 There's my nephew, he's an eyewitness.
4     Q.  How is he -- I'm saying, how is your nephew an
5 eyewitness?
6     A.  Because he seen it.
7     Q.  Did he see Mark Frye, Jeff Watts, Tom Carey,
8 Scott Dick do this?
9     A.  Yes.
10     Q.  Does it take all four of those individuals to
11 do this?
12     A.  Well, I guess they're a party, they work
13 together. I don't know if it takes all four. I don't know
14 how to make a bomb.
15     Q.  You, yourself, never saw these four people make
16 this water bomb, correct?
17     A.  No. I never saw them pour brake fluid on my
18 chicken.
19     Q.  You believe because of other things that have
20 happened, that these are the individuals behind these --
21     A.  Yes.
22     Q.  -- pranks; is that right?
23        MR. TAMARKIN: I'm going to object to that. He
24 already testified he saw them laugh at this when it

1 happened.
2        He also testified that they weren't surprised
3 when it happened and some other evidence in this. I
4 just want the record to be clear.
5     Q.  Sticking with the water bombs, how many water
6 bombs were there?
7     A.  Several.
8     Q.  So less than ten?
9     A.  Less than ten.
10     Q.  When these bombs exploded, what happened?
11     A.  They exploded. Water went everywhere. I mean,
12 I guess they wouldn't be -- wouldn't blow the shop down or
13 anything.
14        But, I mean, pieces of plastic could have -- I
15 wasn't injured, no.
16     Q.  Did a piece of plastic hit you?
17     A.  No. I wasn't injured.
18     Q.  So a piece of plastic didn't hit you?
19     A.  It might have but I wasn't injured.
20     Q.  Did water hit you?
21     A.  Sure, all over my toolbox, everywhere.
22     Q.  Did you suffer any property damage?
23     A.  My tools, I had to dry them off, and personal
24 papers, bills I had in my tool box.

1     Q.  Did you suffer any personal injury?
2     A.  No. I wasn't hurt.
3     Q.  And the time frame of your employment at
4 Columbia Oldsmobile, when did these instances occur?
5     A.  Along with all the other pranks, they were
6 continuous. I can't give you dates because there were so
7 many done to me and they weren't -- they weren't -- how
8 would I word it, they weren't disciplined.
9     Q.  Okay. How were these pranks, in your mind,
10 discriminatory against you? How were these pranks
11 discriminatory against you?
12        MR. TAMARKIN: Objection. Besides the obvious
13 comments and the hanging and the noose?
14        MR. LANGENBAHN: No. No.
15        MR. TAMARKIN: Water -- you said pranks. I
16 wanted to make sure.
17     Q.  How was the water a prank?
18     A.  I would say probably with the water, one of
19 them was probably done same day with the noose.
20        There were several pranks done in one day that
21 weren't addressed. I brought them to management's
22 attention. I brought them to management's attention and
23 they were still continued. I didn't understand it. I
24 still don't understand it.

12 (Pages 123 to 126)

1    Q.   Okay.  So each time, these several times, which
2  is less than ten, that the water incidents occurred, you
3  went each time to complain to Bob Branigan?
4    A.   Absolutely.
5    Q.   What did you tell Bob Branigan?
6    A.   They're at it again, their racial pranks.  I
7  don't know why they're singling me out.  What did I do to
8  these people?
9    Q.   Did you tell them the racial prank involved a
10  water --
11    A.   I'm sure I said that on --
12    Q.   -- a water bomb?
13    A.   I'm sure I've done said that on prank events.
14    Q.   Did you tell them?
15    A.   I can't remember.  I mean, I'm upset.
16    Q.   Well, when you said prank, did Mr. Branigan
17  say, what do you mean by prank?
18    A.   No, he never even elaborated on it like that.
19    Q.   What was Mr. Branigan's response?
20    A.   I'll handle it.  I'll handle it.  Get back to
21  work.
22    Q.   What's the next incident that you claim --
23    A.   I don't know if it was the next one.  I had
24  brake fluid on chicken.

1    Q.   Well, let's go to this one.  You just mentioned
2  that one.  Brake fluid on chicken.  When was that?
3    A.   I can't remember the date.  It just was
4  unpleasant.
5    Q.   How many times?
6    A.   Well, actually the brake fluid on the chicken,
7  I decided not to eat my lunch like that again since it
8  almost killed me if I would have consumed it.
9    Q.   Well, are you saying -- I asked you how many
10  times did it occur.
11    A.   On the chicken?
12    Q.   Yeah.
13    A.   I said I -- I -- it only occurred one time
14  because I used common sense and I wouldn't leave my chicken
15  out for it to be tampered with.
16        And actually I took that to Mr. Branigan and
17  brought that to his attention because I thought that was
18  very dangerous and I didn't consider it a prank.
19    Q.   Where did you get the chicken?
20    A.   Bigg's.  I think it was Banquet spicey hot, a
21  pound box, microwave for about six minutes, and that's what
22  my lunch was.
23    Q.   Okay.  And who put brake fluid on your chicken?
24    A.   Mark Frye, Jeff Watts.

1    Q.   Did you see them do it?
2    A.   I saw my Styrofoam plate disintegrate.
3        MR. TAMARKIN:  We covered a little bit of this
4  last time.
5        MR. LANGENBAHN:  No, we didn't.  You look --
6        MR. TAMARKIN:  All right.  All right.  I think
7  he covered -- maybe it was --
8        MR. LANGENBAHN:  It was him.
9        MR. TAMARKIN:  Okay.
10    Q.   How did the Styrofoam plate disintegrate?
11    A.   Because brake fluid is a chemical.  Styrofoam
12  can't -- you put brake fluid in this cup right here, it's
13  going to eat that cup.
14    Q.   Did you see Mark Frye and Jeff Watts put the
15  brake fluid on your chicken or your Styrofoam container?
16    A.   No.  Can I elaborate?
17        MR. TAMARKIN:  Yeah, you can elaborate.  You
18  can explain.
19    A.   I've seen them inject lithium grease in my
20  donut.
21        MR. TAMARKIN:  I didn't mean to elaborate like
22  that but that's okay.
23    Q.   So because you saw them inject lithium grease
24  in your donut, you assumed that they put the brake fluid on

1  your chicken?
2    A.   Absolutely.
3    Q.   Now, you're telling me that somehow you were
4  warned or found out about the fact that there was brake
5  fluid on your chicken?
6    A.   Yes.
7    Q.   Okay.  You never ate the chicken?
8    A.   No, because there wasn't a plate there, and I
9  know that, being that I have ate Banquet chicken before, it
10  hasn't been that greasy and that shriveled up.
11        There was brake fluid running off the table.
12  And I know I didn't leave my lunch like that.  I know it
13  had a plate there.
14    Q.   Now, you didn't suffer any personal injury as a
15  result of that incident?
16    A.   I didn't eat it, no.
17    Q.   You were out the chicken?
18    A.   Please?
19    Q.   You lost the chicken?  You didn't get to eat
20  the chicken?
21    A.   No.
22    Q.   How much did the chicken cost you?
23    A.   Mr. Branigan compensated me when I brought it
24  to his attention and he told me to go get lunch again.

13 (Pages 127 to 130)

Page 139

1  I said, he's a smart man, two and two equals four.
2      Q.  But you're telling me he didn't make any
3  inquiries?
4      A.  He said he would handle it.
5      Q.  He didn't say, how did this get on your donut?
6      A.  He didn't need to ask that.  I don't know.
7      Q.  He didn't say --
8      A.  No, he didn't.
9      Q.  -- who put this on your donut?
10     A.  No.
11     Q.  He said, I will take care of it?
12     A.  Yes.
13     Q.  And did he take care of it?
14     A.  No.  That's why we're here today.
15     Q.  All right.  Now, the next incident is hot sauce
16  on a donut?
17     A.  Yeah.
18     Q.  When did that incident happen?
19     A.  I can't give you a date.  I was working at
20  Columbia Oldsmobile.
21     Q.  And how was it that hot sauce got into your
22  donut?
23     A.  It was injected.  I guess they do it the same
24  way you do jelly, jelly-filled donut, they inject it into

Page 140

1  the donut.
2      Q.  Whose jelly-filled donuts were these?
3      A.  Well, the one that was injected was mine.
4      Q.  I think your counsel preempted you.  Enterprise
5  delivers donuts frequently to the dealership?
6      A.  Yes.
7      Q.  So that's for the people in the service
8  department?
9      A.  For the service.
10     Q.  You went in to get one of the donuts?
11     A.  Yes.
12     Q.  One of the donuts that you got had hot sauce?
13     A.  Not when I got it.  Enterprise didn't do it.
14     Q.  When you got it and you ate it?
15     A.  No.  When I got it, I brought it to my bay and
16  sat it down, I didn't eat it immediately.  I have work to
17  do, so I continued my work.
18         That's when pranks are done, when I'm not aware
19  or --
20     Q.  Did you eventually eat the donut?
21     A.  No.  My nephew, bless his heart, he instructed
22  me, don't eat it.
23     Q.  So he told -- your nephew, Andre Tucker, said,
24  don't eat the donut because someone --

Page 141

1      A.  Throw it away.
2      Q.  -- put hot sauce in the donut?
3      A.  It's injected with hot sauce.
4      Q.  Did he tell you who did that?
5      A.  Well, actually while he was informing me that
6  it was injected, we viewed the individuals that did it
7  and they were looking for me to consume the donut, to eat
8  it.  We made eye-to-eye contact.
9      Q.  Who was that?
10     A.  Jeff Watts, Mark Frye, Tom Carey and Scott
11  Dick, which they thought it was humorous, because that
12  prank didn't go through, I guess.
13     Q.  So what did you do with the donut?
14     A.  I pitched it.
15     Q.  Did you report this incident to --
16     A.  Not that one.  I think -- I think I just
17  pitched that one.
18         When I see things aren't being done, I
19  basically have to go a different route.  So my different
20  route was to pitch it and just go on back, continue
21  working.
22     Q.  So you didn't report this --
23     A.  No, not that one, not the hot sauce donut.
24     Q.  -- to Bob Branigan?

Page 142

1      A.  No, I did not report that.
2      Q.  You didn't take the donut with the hot sauce in
3  it and go to Bob Branigan and say, here, look, here's
4  evidence these guys are fooling with me, here's the donut
5  with the hot sauce?
6         MR. TAMARKIN:  Objection.  He's already
7      answered the question.  Objection.  You don't have to
8      answer it again.
9         MR. LANGENBAHN:  Yes, he does have to answer.
10        MR. TAMARKIN:  Because he's answered the
11     question.  You're being argumentative.  He already
12     said he didn't report it.  Now you're putting --
13     you're asking him the same question a different way,
14     acting like you're in trial.
15        This is a deposition.  He doesn't have to
16     answer that again.  Just don't answer it.
17     Q.  You didn't save the donut?
18        MR. TAMARKIN:  You can answer that.
19     A.  I pitched it.
20     Q.  Now, what other -- how was that incident
21  discriminatory against you?
22     A.  I just answered that, I think.
23     Q.  On something else.
24        MR. TAMARKIN:  Answer it again.

16 (Pages 139 to 142)

Page 171

```
1      A.   Absolutely.
2      Q.   You were introduced to me as what?  What was I?
3  What was Jay Langenbahn?
4      A.   I guess you're --
5           MR. TAMARKIN:  Objection.
6      Q.   Go ahead.
7           MR. TAMARKIN:  Objection.  Move to be stricken.
8  You can answer.
9      A.   Columbia Oldsmobile's attorney.
10     Q.   What was Carl Stewart?
11     A.   I still don't know what he is.
12     Q.   You don't know what Carl Stewart's position is?
13     A.   I'm sure he's Mr. Branigan's boss.
14     Q.   Okay.  And you met him relative to the issue
15  involving the carbon monoxide incident, correct?
16     A.   Being terminated, I came -- I came back after I
17  was terminated and Mr. Stewart introduced him, who he was.
18     Q.   He rehired you, correct?
19          MR. TAMARKIN:  Objection.  Asked and answered,
20  covered in the last deposition, this whole incident.
21          MR. LANGENBAHN:  No, it wasn't covered and you
22  know it isn't.
23          MR. TAMARKIN:  Objection.  You can answer.
24     A.   I already answered it.
```

Page 172

```
1      Q.   He rehired you, correct, Mr. Stewart did?
2      A.   Yeah.
3      Q.   Okay.  And after that incident you really had
4  no further contact with Mr. Stewart?
5      A.   Almost every day.
6      Q.   Almost every day you had contact with Mr.
7  Stewart?
8      A.   Almost, after that incident, yeah.
9      Q.   You never complained?
10     A.   Absolutely from that point.
11     Q.   To Mr. Stewart?
12     A.   From that point Mr. Stewart knew what was going
13  on in the shop and they had a prank meeting, what you
14  call --
15     Q.   Sir, we just went through 10 or 12 instances
16  and I asked you who you complained to.  You said, after the
17  carbon monoxide I was introduced to Mr. Stewart.
18     A.   After I was fired by Mr. Branigan and -- I was
19  introduced to Mr. Stewart when I came to pick up my check
20  and he rehired me.
21     Q.   Okay.
22     A.   And from that point on, it seems like I was in
23  Mr. Stewart's office every day.
24     Q.   What were you in Mr. Stewart's office --
```

Page 173

```
1      A.   About something I had done.
2      Q.   Did you complain to Mr. Stewart --
3      A.   Sure.
4      Q.   -- that --
5           MR. TAMARKIN:  Let him finish the question,
6  then you can answer.
7      A.   These incidents had occurred when they
8  occurred.  I'm talking about spontaneously.  Incident
9  happened, you go to Mr. Stewart and say, Mr. Stewart, this
10  happened -- that didn't happen that way, you went to Mr.
11  Branigan, correct?
12     A.   Before I met Mr. Stewart?
13     Q.   Right.
14     A.   Before I met Mr. Stewart, sure, I went to Mr.
15  Branigan.
16     Q.   And then after you met Mr. Stewart on or about
17  March 1st, 2000, did you go to Mr. Stewart after that when
18  an event occurred and you go to him and say, Mr. Stewart,
19  this event occurred, they pulled me up on a noose and hung
20  me?
21     A.   Those events occurred before I met Mr. Stewart.
22     Q.   So all those events occurred before Mr.
23  Stewart -- right before you met Mr. Stewart?
24     A.   No, the nooses that you're speaking of happened
```

Page 174

```
1  before Mr. Stewart, yeah.
2      Q.   Okay.  What about the incident involving Harry,
3  where --
4      A.   Yes, that happened before Mr. Stewart.
5      Q.   So the incident involving where Harry says he's
6  tired of your black ass --
7           MR. TAMARKIN:  Objection.
8      Q.   -- and when he said, take a swing at me, that
9  occurred before Mr. Stewart?
10     A.   That happened before Mr. Stewart.
11     Q.   So did this incident involve, where he tried to
12  throw coffee, that happen before Mr. Stewart, right?
13     A.   Yes.
14     Q.   Now the incident about injecting hot sauce into
15  the donut, that happened before Mr. Stewart?
16     A.   Yes.
17     Q.   The incident involving the chicken, that
18  happened before Mr. Stewart?
19     A.   Yes.
20     Q.   The incident involving --
21          MR. TAMARKIN:  Objection.  Ask him what
22  happened after Mr. Stewart.
23     Q.   The incident involving spraying of lithium
24  grease on your shoes and lighting that, that occurred
```

24 (Pages 171 to 174)

Page 175

1  before Mr. Stewart?
2      A.  Yes.
3      Q.  And the incident --
4          MR. TAMARKIN:  Keep answering truthfully.
5  Don't look at me.
6      Q.  The incident involving the water bombs, that
7  occurred before Mr. Stewart?
8      A.  Yes.
9      Q.  And going up to PDI, then, coming back,
10  somebody trying to run you over, that occurred before Mr.
11  Stewart?
12      A.  That was several times that happened.  I think
13  I did report those to Mr. Stewart, yeah.  Not all of them,
14  because some of them occurred before Mr. Stewart.
15          MR. TAMARKIN:  I've got to take five minutes.
16          (A recess was taken from 3:40 to 3:47.)
17      Q.  We're going back to this Exhibit 4.  You say
18  there was also racial graffiti on the wall of the restrooms
19  at work and typed on the shop computers.  Do you see that?
20      A.  Yes.
21      Q.  So that is something we haven't talked about
22  yet, isn't it?
23          MR. TAMARKIN:  Are you asking me?
24          THE WITNESS:  Are you speaking to me?

Page 176

1          MR. LANGENBAHN:  I am speaking -- Mr. Tamarkin
2  is not sworn.  I'm just smiling at Mr. Tamarkin.
3      Q.  We haven't talked about that yet, correct?
4      A.  Not in this sitting.
5      Q.  Okay.  What was the racial graffiti on the
6  walls of the restroom?
7      A.  Racial slurs, go back to Africa, nigger.
8  Racial slurs that were unpleasant.  Black monkey.
9      Q.  This restroom that you're referring to is in
10  the shop area?
11      A.  Yes.  In -- yes.
12      Q.  And did you bring this -- these statements to
13  the attention of anybody at Columbia Oldsmobile?
14      A.  Yes.
15      Q.  Who did you bring it to the attention of?
16      A.  Mr. Branigan.
17      Q.  Would Mr. Branigan use this restroom?
18      A.  Yes.
19      Q.  He would use the restroom?
20      A.  If he is in the shop and he has to use it, I
21  would think.
22      Q.  Doesn't he have access to other restrooms?
23      A.  I don't know.  I mean --
24      Q.  If they were on it he would have the ability to

Page 177

1  see these same remarks that you saw, right?
2      A.  He seen them.
3      Q.  What -- you reported to him, what did he say?
4      A.  He seen them and he reported it to his
5  superior, Mr. Peters, which had the shop painted.
6      Q.  So then somebody had the shop painted?
7      A.  Not somebody, the service manager.
8      Q.  Mr. Peters had the shop painted; is that right?
9      A.  Yes.
10      Q.  Okay.  And --
11      A.  The bathroom.
12      Q.  What's that?
13      A.  I was in the bathroom.
14      Q.  I'm sorry, had the bathroom painted.  Do you
15  know who put these graffiti or put the graffiti on the
16  walls?
17      A.  Same people.
18      Q.  You don't know for sure?
19      A.  I mean, considering what -- what went on with
20  me, I assumed that it's the same people.
21      Q.  I'm not trying to be smart aleck but nobody did
22  a handwriting analysis to determine who did it, right?
23      A.  I don't know.  It was removed.
24      Q.  It was removed.  Once it was removed did it

Page 178

1  come back?
2      A.  What do you mean?
3      Q.  Did somebody then put some more graffiti on --
4      A.  No.
5      Q.  -- because it was gone then.
6      A.  No, it did not come back.  There was -- Mr.
7  Peters had it removed and he said if there's anything on
8  there again, someone will answer for it, and it never came
9  back.
10      Q.  Now, what's the -- says here, typed on the shop
11  computers.  What are you referring to there?  Racial --
12  you're saying racial graffiti on shop computers?
13      A.  Yes.
14      Q.  What was the racial graffiti on shop computers?
15      A.  Go back to the hood, to the ghetto, have my --
16  pull my house up on the computer and I guess you get a
17  printout or -- stationary, your house can stay stationary
18  while they can ad-lib things in writing.  They put black
19  little pictures in the front of my yard.  Dope dealers.
20          I assumed that was me out in the front of the
21  house working on a car.  You know, just idiotic things once
22  again, which was irritating.  What could I do?
23      Q.  Let me understand this.  Go back to the hood.
24  How is that discriminatory?  I don't know, you need to tell

25 (Pages 175 to 178)

Page 183

1   Q.  That there was this information on the
2 computer?
3   A.  Yes.
4   Q.  Where was this computer located?
5   A.  It was located in Mr. Frye and Mr. Watts' --
6 I shouldn't even call them Mister Mark Frye and Jeff Watts'
7 stall. They had access to a computer which they played
8 with.
9   Q.  You told Bob Branigan about this screen that
10 was on the Internet showing your house and then saying, go
11 back to the hood, nigger, go back to Africa, with black men
12 on it?
13   A.  With black pictures on it. I wouldn't consider
14 it a man. Oh, yes. Yes.
15   Q.  What did Bob Branigan say?
16   A.  Well, when Bob Branigan got to the screen it
17 was deleted and the only thing there was my house.
18   Q.  So he then sees your house and he says, what
19 about it?
20   A.  I told him what I'm just telling you, what was
21 there. It was deleted and it became humorous again. You
22 know, nothing was done.
23   Q.  Said, he didn't do anything?
24   A.  No.

Page 184

1   Q.  You didn't report this incident to Carl
2 Stewart, correct?
3   A.  I don't think I -- this incident happened
4 before Mr. Stewart, I think it did. I told him about it,
5 eventually, when we were -- after we were introduced and I
6 found myself coming in this office daily.
7       I tried to get him up to date with what Jeffrey
8 Denton has been going through.
9   Q.  That incident occurred before you met Carl
10 Stewart?
11   A.  Yes.
12   Q.  Okay. Now, you say here, the next comment in
13 this after -- lithium grease was placed on the bathroom
14 door handle and on the floor of the bathroom.
15       Now, we talked about the lithium grease in the
16 bathroom, right?
17   A.  I mentioned the door also.
18   Q.  You mentioned the door handle.
19   A.  Yes.
20   Q.  So what happened there is you reached for the
21 door and you hit lithium grease; is that right?
22   A.  Coming out, yeah.
23   Q.  Now, that was a prank?
24   A.  All of this was done to me by people that said

Page 185

1 they didn't like me.
2   Q.  That didn't cause you any personal injury,
3 right?
4       MR. TAMARKIN: Objection.
5   A.  No.
6   Q.  Didn't cause you any property damage?
7   A.  No.
8   Q.  Just a matter of you, then, had to, with this
9 lithium grease on your hand, you had to wipe it off, is
10 that right?
11   A.  Yeah.
12   Q.  Okay. You don't believe that that was done to
13 any other people?
14   A.  No, I don't.
15   Q.  Okay. Did you report the lithium grease on the
16 door handles to Mr. Branigan?
17   A.  Probably. I can't remember.
18   Q.  And did he do anything about it?
19   A.  I can't remember if I reported it.
20   Q.  Did you ever say anything about the lithium
21 grease on the door handle to Carl Stewart?
22   A.  Probably. I can't remember.
23   Q.  Look at the next comment. It says, while using
24 the toilet someone sprayed brake cleaner on the floor,

Page 186

1 turned off the lights and lit the brake cleaner on the
2 floor. We've already talked about that, right?
3   A.  Yeah.
4   Q.  You say your shoes were on fire and "when I was
5 running out I slipped and I could not open the door." This
6 happened around January 2000, right?
7   A.  I don't know the date.
8   Q.  That's what you say here in the affidavit?
9   A.  Well, I don't know the date that it happened.
10 We're in 2003. I tried to black all this out, you know
11 what I'm saying?
12   Q.  Okay.
13   A.  That slang.
14   Q.  You complained to Bob Branigan about that
15 incident? That's right? True?
16   A.  I'm sure I did.
17   Q.  He said he would handle it, right?
18   A.  Where are you at now? Did you turn the page
19 yet?
20   Q.  "He told me he would handle it but that was in
21 1999 and the pranks continued."
22   A.  Yeah. If I said it, it happened.
23   Q.  Witnesses to the above include Bill Larkin, a
24 janitor, right?

27 (Pages 183 to 186)

Page 187

1    A.   Yes.

2    Q.   And Rocky Fredericks, right?

3    A.   Mr. Larkin.  Yes.

4    Q.   Now, your next thing on your affidavit, you

5    say, on February 22, 2000 I was feeling ill at work from an

6    ulcer and told the dispatcher, Mr. Scott, that I was going

7    into the cafeteria to rest.  You see that?

8    A.   Mr. Scott, who is Mr. Scott?  Mr. Scott, that

9    was going -- oh, that was Scott Dick, the dispatcher.

10    Q.   Scott Dick?

11    A.   No, not Scott Dick.  Scott the dispatcher.

12    Scott, one of my witnesses.

13         MR. TAMARKIN:  Rogers?

14    A.   Yeah.  He was a dispatcher.  He was temp.  He

15    was terminated.

16    Q.   Now, are you saying that all the things on the

17    first page, they all occurred before this incident

18    involving the incident on February 22, 2000?

19    A.   All the things on the first page, the dummies,

20    all that, yeah.  I think the carbon monoxide -- I think the

21    carbon monoxide actually was the grand finale.

22    Q.   Okay.  Now --

23    A.   I think.

24    Q.   Let me ask you, you say here, I got so sick at

Page 188

1    work that I had to go to the hospital.  Let me ask you

2    about that.

3         This incident happened on February 22, 2000.

4    Did you go to the hospital that day, the next day --

5         MR. TAMARKIN:  Objection.

6    Q.   -- or what day did you go?

7         MR. TAMARKIN:  Objection.  That's definitely --

8    want to go in the deposition and see?  You've covered

9    the whole issue.

10         MR. LANGENBAHN:  I just want to know when he

11    went to the hospital.

12         MR. TAMARKIN:  you asked that at the previous

13    deposition.

14         MR. LANGENBAHN:  Well, show me where it is.

15    I'm going to find it here.  I'll look.  I don't see

16    it.

17    A.   It's in there.

18         MR. TAMARKIN:  You went through the whole

19    incident.

20    A.   I remember answering it.

21         MR. LANGENBAHN:  You're thinking of Andre.  I

22    never went into that incident at all.  I'm just

23    showing you.  Here's my summary.  You can look at it.

24         MR. TAMARKIN:  Go ahead.

Page 189

1         MR. LANGENBAHN:  I'm sorry.

2         MR. TAMARKIN:  My fault.  I thought you did.

3    Go ahead.

4    Q.   You say here in your affidavit that the carbon

5    monoxide incident occurred on February 22, 2000.  Okay.

6    Got that?

7    A.   I'm looking at it.

8    Q.   Let's go through the incident.  You're not

9    feeling too well.  What's your problem?  What medical

10    problem were you experiencing?

11    A.   I have an ulcer.

12    Q.   And you told Scott Rogers that you weren't

13    feeling well?

14    A.   I said to Scott Rogers, I think it was him, he

15    was a dispatcher at that time, I'm going to go to the

16    restroom.

17    Q.   Wouldn't you tell Bob Branigan?  Wouldn't that

18    be the person you'd tell?

19    A.   Well, Branigan wasn't available.  He might have

20    been out on a test drive or something.  There was a reason

21    I told Scott Rogers.

22    Q.   Scott Rogers, was he in a supervisory capacity?

23    A.   There was a reason I told him.

24    Q.   What was the reason?

Page 190

1    A.   Mr. Branigan wasn't available.  He could have

2    been upstairs, he could have been off that day.  I don't

3    know.  There's a reason that I didn't tell him.

4    Q.   Okay.  So then you went in to the cafeteria to

5    rest?

6    A.   To recuperate.

7    Q.   Is it a cafeteria or the break room?

8    A.   It's everything, all of the above.

9    Q.   Is it also a restroom?

10    A.   Yeah.  Isn't that terrible?  Yeah.

11    Q.   So it's a break room, cafeteria, and a

12    bathroom?

13    A.   Yeah.  Sounds bad, don't it?

14    Q.   You were resting in there?

15    A.   Recuperating, trying to bounce back.

16    Q.   What happened?

17    A.   I got -- went into the waiting room and got me

18    two cold beverages to put on my stomach to -- to, abdominal

19    pain in my stomach, the cold beverages, not open, just

20    putting the cold can on my stomach sometimes would help

21    matters.  I put them on my stomach and I put my head down

22    upon the table to see if I could bounce back.

23         And I was sitting there.  The door closed and

24    the room filled up with smoke.

Page 207

1 he went the first day or second day or third day?
2 What is the relevance? Why are we getting into this?
3 This is a racial discrimination case.
4    MR. LANGENBAHN: I need to know.
5    MR. TAMARKIN: You don't need to know. What
6 you're trying to do, Jay, is you're – I'm not going
7 to get into it.
8    MR. LANGENBAHN: I want to know the factual
9 information here.
10    Q. You didn't go to the hospital the day of the
11 incident, right?
12    MR. TAMARKIN: I'm just going to shut up.
13    A. No.
14    Q. You think you went maybe on the 24th as opposed
15 to the 23rd, right?
16    A. Yes.
17    Q. Reading this affidavit and thinking about it,
18 did you go to work the next day, on the 23rd?
19    A. I don't know if I went to work the next day.
20    Q. Okay. You say here in your affidavit, on
21 February 24 I saw Frye, Watts, Dick at work. So I'm
22 assuming you went to work on the 24th; is that right?
23    A. I saw Frye and Watts and Dick at work, yeah.
24    Q. Did you go to work on February 24th?

Page 208

1    A. I don't know if it was the 24th.
2    Q. You say that in your affidavit.
3    MR. TAMARKIN: Objection. It's argumentative.
4 You can't keep arguing with the damn witnesses. If
5 you keep it up I'm going to stop the deposition. You
6 can't argue, you can ask him questions.
7    MR. LANGENBAHN: What's true, what's in this
8 affidavit or what he's testified to?
9    MR. TAMARKIN: You can't argue about –
10    MR. LANGENBAHN: I'm not arguing.
11    MR. TAMARKIN: You argue with him every time he
12 says something.
13    MR. LANGENBAHN: Ivan, let's lay it on the
14 line. The issue in this case is about credibility.
15    MR. TAMARKIN: It's about discrimination.
16    MR. LANGENBAHN: It's about credibility.
17    MR. TAMARKIN: You cannot argue with the
18 witness in a deposition.
19    MR. LANGENBAHN: Is he credible in this
20 affidavit or is he –
21    MR. TAMARKIN: You can argue that to the jury
22 if you want to in your closing argument, but you
23 can't argue with the witness.
24    MR. LANGENBAHN: I'm not arguing. I want to

Page 209

1 know –
2    MR. TAMARKIN: He says he doesn't know. He
3 says – he said he didn't know three times and you
4 argue with the witness.
5    MR. LANGENBAHN: I'm not argue –
6    MR. TAMARKIN: You try to set your closing
7 argument up through your deposition. You can't do
8 it. I'm not going to allow you to do it.
9    Believe me, I've been an attorney longer than
10 you, Jay, you can't do it.
11    Q. Sir, did you go to work on the 23rd of
12 February?
13    A. I don't know.
14    Q. Did you go to work on February 24th?
15    A. I don't know if I returned to work the next
16 day, if that was the next day. I can't remember back that
17 far.
18    Q. And when you returned to work, whatever day it
19 was, you were concerned about what the disciplinary actions
20 were against Frye, Watts and Dick; is that right?
21    A. Yes.
22    Q. Okay. And you asked Bob and Jim about – Bob
23 Branigan and Jim Peters what the disciplinary action was,
24 right?

Page 210

1    A. Yes.
2    Q. And they said it was not -- not any of your
3 concern; is that right?
4    A. They said they would handle it, let them handle
5 it, correct.
6    Q. Okay. Now, you say in your affidavit, "I then
7 got up set with the three men who had hurt me and started
8 yelling at them." Tell me about what happened there.
9    A. Well, nothing was – to my knowledge it seemed
10 like nothing was being done and I was upset.
11    Q. So you went to Jim Peters and you went to Bob
12 Branigan, they said, listen, you shouldn't concern
13 yourself, we'll take care of this?
14    A. Basically, yes.
15    Q. You didn't think that anything was being done;
16 is that right?
17    A. After a couple days have passed, yes.
18    Q. So then you got upset about that?
19    A. Yes.
20    Q. And how did you get upset about it? What did
21 you do?
22    A. I got upset with people that done it to me and
23 I went to management again.
24    Q. So when you say you got upset with the people

33 (Pages 207 to 210)

Page 211

1  that done it to you, you specifically identify Frye, Watts,
2  and Dick, right?
3      A.  Yeah.
4      Q.  How did you get upset with them?
5      A.  How did I get upset?  From what was done to me
6  is how I got upset.
7      Q.  No, but what did you do?
8      A.  I didn't do anything.  I showed my emotions.  I
9  was upset.  They could tell I was provoked.
10     Q.  Did you yell at them?
11     A.  They told me how they felt about the incident,
12  that nothing was going to happen to them, and I was
13  provoked about it.
14     Q.  So they say, we didn't do anything wrong about
15  this incident?  What did they say to you?
16     A.  Who's "they"?
17     Q.  They, I guess the people we've been talking
18  about, Frye, Watts, and Dick.
19     A.  Well, nothing had happened to them.  I felt
20  like they should have been terminated immediately.
21     Q.  Did you tell that to Bob Branigan --
22     A.  Yes.
23     Q.  -- or Jim Peters?
24     A.  Yes.

Page 212

1      Q.  Who did you tell it to?
2      A.  Both.
3      Q.  So you told Bob Branigan and Jim Peters, I feel
4  that Frye, Watts, and Dick should be terminated for what
5  they did to me?
6      A.  They should have been.
7      MR. TAMARKIN:  Objection.  Asked and answered.
8  Can you repeat the question and ask him again?
9  That's what I'm talking about, you don't have to do
10 that.  We're not on cross-examination.
11     MR. LANGENBAHN:  I'll move on.
12     MR. TAMARKIN:  Thank you.
13     Q.  What do Peters and Branigan say when you told
14 them that you think Frye, Watts and Dick should be
15 terminated?
16     A.  Said they should be arrested and I will seek --
17     MR. TAMARKIN:  Just answer his question.
18 Listen to his question.
19     Q.  What did -- what did Peters and Branigan say to
20 you?
21     A.  That they would handle it.
22     Q.  They said they will handle it?
23     A.  Uh-huh.
24     Q.  When did it come in that you said you felt they

Page 213

1  should be arrested?
2      A.  When I went in, decided to go to the
3  authorities.
4      Q.  Did you tell Bob Branigan and Jim Peters that
5  you thought Frye, Watts and Dick should be arrested?
6      A.  After I went to the authorities, absolutely.
7      Q.  When did you go to the authorities?
8      A.  Probably days later when I realized that my
9  supervisors didn't care.
10     Q.  And what authorities did you go to?
11     A.  Montgomery police.
12     Q.  Did you go -- did you call them on the phone,
13 did you just go down to their station, or how did that
14 work?
15     A.  I went down to their station.
16     Q.  When you went there what did you tell them,
17 what did you say?
18     A.  Exactly what happened to me.
19     Q.  And who did you talk to?
20     A.  Detective Platchy (phonetic).
21     Q.  Is he white or black?
22     A.  He's white.
23     Q.  Platchy?
24     A.  Platchy.

Page 214

1      Q.  Tell me what you told detective Platchy.
2      MR. TAMARKIN:  Objection.  He just told you
3  that he said the same thing he's told everybody else.
4  That's enough.
5      MR. LANGENBAHN:  I've got a right to know what
6  he told Platchy.
7      MR. TAMARKIN:  You know what I'm going to do,
8  I'm going to put this deposition up for Beckwith to
9  look at your questions.  I'm going to ask for fees
10 for my time because you're asking the same question
11 over and over and over.
12     You can ask the question.  Go ahead.  He told
13 you the same thing he said before what happened.
14 Isn't that enough?
15     MR. LANGENBAHN:  I don't know.
16     MR. TAMARKIN:  You keep on asking the same
17 questions.  You're taking my time for no reason
18 because you keep on asking the same questions.
19     Q.  What did you tell Detective Platchy?
20     A.  Same thing I just said.
21     Q.  You told Detective Platchy about the incident
22 that occurred at Columbia Oldsmobile?
23     A.  Yes.
24     Q.  Okay.  Did you tell Detective Platchy that you

34 (Pages 211 to 214)

Page 223

1   we are. He gets terminated. He gets terminated by
2   Bob Branigan because he's yelling and screaming.
3       MR. TAMARKIN: I'm just objecting, Jay. You
4   don't have to testify.
5       A.   I got terminated because I'm black, basically.
6       Q.   Okay.
7       A.   I don't think I got terminated because I was
8   yelling and screaming. That's what —
9       Q.   Were you saying some bad words in the service
10  department?
11      A.   No. No.
12      Q.   Were you saying fuck this, fuck that?
13      A.   I don't use profanity. I don't use profanity.
14      Q.   You weren't saying bad words?
15      A.   I don't use profanity. I don't use —
16      Q.   Were you yelling and screaming?
17      A.   Probably. I yell. I'm screaming now. My
18  voice is heavy.
19      Q.   What did —
20      A.   I talk in the shop with guns and machine tools
21  running, I'm talking deep now.
22      Q.   So Bob Branigan comes out and says — what's he
23  say to you on February 24?
24      A.   You're fired.

Page 224

1       Q.   That's all he says?
2       A.   Basically.
3       Q.   Says you're fired?
4       A.   That's it. Isn't that something?
5       Q.   Did he come out and say, Jeff, you got to keep
6   your mouth —
7       A.   No.
8       Q.   — clean?
9       A.   No.
10      Q.   You can't be cussing here?
11      A.   No.
12      Q.   You can't be yelling and screaming?
13      A.   No.
14      Q.   You're yelling and screaming just wasn't you,
15  Andre was involved in this, too, wasn't he?
16      A.   Scott Dick, Mark Frye, there were several
17  individuals involved. We were the only two terminated.
18      Q.   Who were they?
19      A.   The two terminated, me and my nephew.
20      Q.   No, who were the people involved?
21      A.   Mark Frye, Jeff Watts. Mark Frye, Jeff Watts,
22  Tom Carey, Scott Dick. They surrounded me. Jason and —
23  Jason Dick, also. They surrounded me.
24      Q.   Who else? Your name, Jeff Denton?

Page 225

1       A.   Yeah.
2       Q.   Andre Tucker?
3       A.   Yes.
4       Q.   Anybody else?
5       A.   That's about six or seven individuals right
6   there.
7       Q.   Anybody else?
8       A.   And we were singled out, us two, and we were
9   terminated.
10      Q.   Was this a situation where Andre and you were
11  confronting Frye and Watts?
12      A.   I wasn't confronting anybody.
13      Q.   And saying, don't ever think you're going to do
14  this again or we're going to get you?
15      A.   No.
16      Q.   Nothing happened like that?
17      A.   No.
18      Q.   You didn't — I'm sorry, go ahead.
19      A.   Pranks were done against me. Why would I
20  surround someone and threaten them? All the time I've been
21  going to my superior or my supervisor trying to get results
22  from him.
23          Why would I come and surround seven technicians
24  and tell them what I'm going to do to them?

Page 226

1       Q.   You and Andre didn't threaten —
2       A.   No.
3       Q.   — Watts and Frye?
4       MR. TAMARKIN: You have to wait until he
5   finishes his questions.
6       THE WITNESS: He's asking them over and over.
7       MR. TAMARKIN: You're jumping into his
8   questions and you — you have to listen to what I
9   tell you, okay?
10      THE WITNESS: Okay.
11      MR. TAMARKIN: You don't listen.
12      Q.   You didn't threaten Frye and Watts?
13      A.   No.
14      Q.   Didn't yell and scream at Frye and Watts?
15      A.   I talk in a deep voice. I screamed through the
16  shop deli.
17      Q.   Well, in your affidavit you say that, "I then
18  got up set with the three men who had hurt me and started
19  yelling at them."
20      A.   Well, that's a figure of speech.
21      Q.   What do you mean by "yelling" at them?
22      A.   I talk with a deep voice. I'm yelling now.
23  I'm not mad at you.
24      Q.   Okay. And you were then terminated?

37 (Pages 223 to 226)

Page 227

1    A.   Yes.
2    Q.   Andre was terminated?
3    A.   Yes.  I don't know how it -- maybe he just
4  pointed at each one of us, you're fired, you're fired, and
5  that was it.
6    Q.   Bob Branigan?
7    A.   We headed for our car.  He followed me out to
8  my nephew's vehicle.  There was no dispute.  I told him I
9  would seek an attorney.
10    MR. TAMARKIN:  Were you asked all this?
11    Q.   Did you say to Bob Branigan, am I fired?  Did
12  you like question him whether you were fired?
13    A.   I said, are you firing me?  He said, yes,
14  you're fired.
15    Q.   Did you say, good, that's what I wanted?
16    A.   No.
17    Q.   Did you say that?
18    A.   No.  No.  Why would I say that?
19    Q.   Now, in your affidavit you say that you then
20  went to the Montgomery police on February 25th, that they
21  went out and questioned management, and the three males who
22  poisoned you were then suspended for three days.  Is that
23  what you say here?
24    A.   Yeah.

Page 228

1    Q.   How did you find out that information?  Did the
2  Montgomery police tell you that?
3    A.   No.  We had Mr. Carl Stewart -- we had a
4  meeting.  Am I supposed to be answering this?
5    MR. TAMARKIN:  Answer the question, yes.
6    THE WITNESS:  Yes?
7    MR. TAMARKIN:  Jeffrey, I can't -- off the
8  record a minute.
9    (Off the record.)
10    Q.   You put information in here --
11    A.   That they were suspended.
12    Q.   That on February 25 you went to the Montgomery
13  police, that they then -- Montgomery police then went out
14  to Columbia and questioned them.
15    Then the three males who poisoned you were
16  suspended for three days.  How --
17    A.   How did I determine that?
18    Q.   How did you learn that?
19    A.   Because Mr. Stewart requested that Mr.
20  Branigan and Mr. Peters have a service meeting and he told
21  what was going on about the pranks, what happened.  There
22  will be no more pranks in the shop.
23    MR. TAMARKIN:  Answer the question.  You
24  learned it because they told you.  That's the answer.

Page 229

1    A.   Because the supervisors told me.
2    Q.   Was this a meeting with everybody present?
3    A.   Yes.
4    Q.   Everybody in the shop?
5    A.   Yes.
6    Q.   Okay.  This occurred -- had a meeting occurred
7  after you signed a release?
8    A.   I don't remember signing a release.
9    Q.   Do you remember getting $7,000?
10    A.   Yeah.
11    Q.   Why did you get $7,000?
12    A.   You tell me.  Why did I get it?
13    Q.   Do you know?
14    A.   No, I don't.
15    Q.   So Columbia Oldsmobile paid you $7,000, paid
16  you back pay for the time that you missed after you were
17  fired, correct?
18    A.   The time I missed after I was fired?
19    Q.   You were fired --
20    A.   For two days.
21    Q.   You missed about three days as a result of
22  being fired, right?
23    A.   Yeah.
24    Q.   Columbia Oldsmobile paid you that money that

Page 230

1  you missed, didn't they?
2    A.   Yeah.
3    Q.   Then paid you another $7,000?
4    A.   Yeah.
5    Q.   Why did Columbia Oldsmobile pay you $7,000?
6    MR. TAMARKIN:  Objection.  Objection.  He said
7  he didn't know.
8    Q.   Okay.  Do you think you owe that money back to
9  Columbia Olds?
10    MR. TAMARKIN:  Objection.
11    MR. LANGENBAHN:  Huh?
12    MR. TAMARKIN:  Objection.  It's not relevant.
13  You can answer.
14    A.   No.
15    (Off the record.)
16    (Denton Exhibits 5 and 6 were marked for
17    identification.)
18    Q.   Sir, I'm going to show you Exhibit Number 5.
19  Take a look at Exhibit 5.  You see that document?  Look at
20  the second page.  Is that your signature on that document?
21    A.   I don't -- I don't know.
22    Q.   You don't know.  Okay.  Take a look at Exhibit
23  6.  Is that your signature on that document?
24    A.   Why is there two of them?

**Ace Reporting Services  (513) 241-3200**
**30 Garfield Place, Suite 620  Cincinnati, Ohio  45202**

1     A     Bob Brautigam, Jim Peters.

2     Q     Let me understand how are you related to Andre?

3     A     He's my nephew.

4     Q     So your brother -- it's your brother's son?

5     A     Yes.

6     Q     And your brother's name is?

7     A     Andre.

8     Q     And it's Andre --

9     A     Denton.

10     Q     And Andre Tucker goes by his mother's name?

11     A     Yes.

12     Q     And how is it that you recommended to Bob

13 Brautigam and Jim Peters, Andre; what did you tell them?

14     A     "He needs a job and he's in the same field that

15 you guys are hiring for, you need a lube tech.  He's a lube

16 tech."  And they brought him in for an interview.  And

17 upon -- I've answered the questions.

18     Q     They brought him in for an interview, and what

19 happened?

20     A     They brought him for in an interview.  I was under

21 the assumption that he was being interviewed for a lube

22 tech, and they hired him as a car wash person.

23     Q     Did you object to him being hired as a car wash

24 person?

25     A     No.

Page 280

1    A    When it was needed.

2    Q    And they agreed to loan you money?

3    A    Sometimes.

4    Q    And you agreed to pay them back, is that right?

5    A    Yes.

6    Q    And is it correct that the loaning of money from
7  Columbia Oldsmobile to Jeffrey Denton occurred after March
8  1st, 2000?

9    A    I would say it was before then.

10    Q    Before then?

11    A    Yes.

12    Q    So if it occurred before March 1st, Columbia
13  Oldsmobile would give you a check, correct?

14    A    Yes.

15    Q    And then they would deduct it out of your pay,
16  your next week's pay?

17    A    Yes.

18    Q    You were paid weekly by Columbia Oldsmobile?

19    A    Yes.

20    Q    Who did you go to to -- the initial loan from
21  Columbia Oldsmobile, who did you go to to negotiate that
22  loan?

23    A    Jim Peters or Mr. Bob Brautigam.

24    Q    Were they in charge of payroll, if you know?

25    A    I don't know.

1    Q    Who was in charge of payroll?

2    A    I don't know who was in charge of payroll.

3    Q    Would they be able to get you a loan from Columbia

4  Oldsmobile?

5         MR. TAMARKIN:  Who?

6    Q    Bob Brautigam and Jim Peters.

7    A    Being that they were my supervisors, I don't know

8  how they got the loan but it was a Columbia Oldsmobile check

9  that I would be given which would be paid back.

10   Q    Did you ever go to Carl Stewart and ask him for a

11 loan from Columbia Oldsmobile?

12   A    Yes.

13   Q    How often?

14   A    Once.

15   Q    Do you know when that was?

16   A    After I met him.

17   Q    And you didn't meet him until after this incident

18 with Mark Fry and Jeff Watts, correct?

19   A    Correct.

20   Q    Let me show you what we've marked as Exhibit 8.

21 Over the course of your employment with Columbia Oldsmobile,

22 you became familiar with employee disciplinary reports?

23   A    Yes.

24   Q    And looking at Exhibit 8, this is an employee

25 disciplinary report dated February 21, 2000.

1      Q    This is an employee disciplinary report, says here

2  that you were told on numerous occasions to use a torque

3  stick when reinstalling lug nuts, "the GM told him to use

4  one on his vehicle because he was not."  See that?

5      A    Yes.

6      Q    Do you recall ever that you were servicing a

7  vehicle that was owned by a General Motors representative

8  and he specifically reprimanded you or stated to you, "Hey,

9  when you service my vehicle I want you to use a torque

10  stick?"

11      A    Let me tell you what I recall.  When I came in to

12  service every day after February 24th, I was singled out.

13  Every place I went in the dealership as far as working on

14  cars, as far as whatever I've done, I was singled out.  If

15  you had x-ray vision, it would burn through my shirt.

16  That's the way everything was after the incident that I

17  filed with EEOC.  It was her harassment and I can't say

18  anything else.  You've got a stack of disciplinary reports

19  that I'm going to give you the same answer on every time.

20      Q    You didn't file your EEOC charge until August of

21  2000, right?

22      A    I don't know.  But I'm saying the carbon monoxide

23  incident, from that point, that's when all this ruckus, and

24  it just wouldn't stop.  I got a disciplinary report every

25  other day at Columbia Oldsmobile.  And the next one I'm

1    probably going to answer the same way, sir.

2        Q    Well, just to refresh your memory, here's the

3    affidavit you filed with EEOC and it's dated August 8, 2000.

4    So you didn't file your complaint with the EEOC until --

5        A    Well, I seeked an attorney before then.  I seeked

6    an attorney after the carbon monoxide incident, which

7    Columbia Oldsmobile was aware of.

8        Q    Who did you go to?

9        A    Ivan Tamarkin.

10       Q    And when did you first contact Mr. Tamarkin?

11       A    I don't know.

12       Q    But my question that started this is, I didn't ask

13   you about a Columbia Oldsmobile representative, I said, do

14   you recall a General Motors representative, someone who

15   worked for General Motors?

16       A    I didn't recall -- everyone was a customer as far

17   as I was concerned.  I didn't know what their occupation was

18   or what they did.  I treated every customer like they were

19   the only customer.  I didn't single out a GM customer from

20   any other.

21       Q    And I understand what you're saying, but I'm just

22   -- what I'm asking, do you recall that someone complained to

23   you and said, "Listen, I work for General Motors and you're

24   doing this wrong?"

25       A    No, I don't.

1      Q      Did some other people get chicken besides you and

2  Andre?

3      A      I'm sure they did.

4      Q      Where would you get the chicken?

5      A      BW-3s.

6      Q      Where did the pizza come from?

7      A      LaRosa's.

8      Q      So the dealership paid for the lunch, is that

9  right?

10     A      I don't know who paid for it.

11     Q      You didn't pay for it?

12     A      Absolutely not.

13     Q      Where was this meeting held?

14     A      In the service department in the garage.

15     Q      Was it in that lunch room there?

16     A      It was in the garage.  No, I wouldn't eat in

17  there.

18     Q      And what did Jim Peters and Bob Brautigam tell

19  everybody?

20     A      "If there is another prank, a hate crime, graffiti

21  written, you will be fired immediately."

22     Q      Anything else?

23     A      Basically I mean everything was on that basis.

24     Q      So they said no more pranks, no more --

25     A      Jokes, no more whatever.  And I think their

1    solution to what happened to me with the carbon monoxide, it

2    was just -- basically I was a loner at Columbia Oldsmobile.

3    No one after that period, no one -- if they weren't doing

4    evil to me they weren't doing anything to me.  I've heard,

5    "Don't speak to Jeff Denton, he'll get you in trouble." I

6    mean, just hearsay as I'm walking.  So there wasn't any

7    pranks that were, noticeable pranks that were performed.

8    They had dropped down to, I wouldn't say a minimum because

9    they continued, but they weren't, you know, out in the open

10   like they were.

11       Q    What pranks occurred -- let me ask you this.  And

12   did Bob Brautigam or Jim Peters say that if an incident

13   occurs, we ask that you immediately report it to us?

14       A    You're speaking of at the service meeting?

15       Q    Yes.

16       A    Yes, but no one did it.

17       Q    So you were made aware that if a prank occurred or

18   something happened --

19       A    I reported my incidents.

20       Q    -- you were supposed to report it?

21       A    Absolutely.  I reported mine.

22       Q    And you were also told, as these other people

23   were, that no other incidents, pranks, would be tolerated,

24   correct?

25       A    Yes, I wasn't doing any.

1    Q    You're supposed to be there at eight o'clock,

2    right?

3    A    Yeah, you're saying there actually I was catching

4    a bus.  I mean, if I was late and I knew I wasn't going to

5    be on time, I phoned.  So why would I --

6    Q    But you knew you were supposed to be there at

7    eight o'clock, correct?

8    A    Sometimes I couldn't get there at eight.

9    Q    And "sometimes"  How often is sometimes?

10    A    I don't know.

11    Q    Is it more than once?

12    A    Yes.

13    Q    More than five?

14    A    Yes.

15    Q    More than ten times?

16    A    In a period of two years, yes.

17    Q    More than thirty times?

18    A    No.

19    Q    So less than thirty?

20    A    Yes.

21    Q    How about less than twenty?

22    A    Yes.

23    Q    Less then fifteen?

24    A    Somewhere around there.

25    Q    Around fifteen times in two years?

1    black ten questions ago.

2         Q    Did you ever see Mark Fry pull a prank on Al

3    Parker?

4         A    Well, I wasn't concerned about Mark Fry pulling

5    pranks on anyone.  I saw him pull them on Mr. Frederick and

6    pulled them on me.  So that was good enough.  I wasn't an

7    investigator I was a service technician.  I was already

8    accused from falling asleep in the cafeteria, so I

9    definitely didn't need to do investigating on somebody

10   pulling pranks.  No, I never witnessed it.

11        Q    Did you ever see Jeff Watts pull a prank on Mr.

12   Parker?

13        A    Wasn't any of my concern.

14        Q    But you were -- it wasn't any of your concern but

15   you observed the fact that Jeff Watts and Mark Fry pulled

16   pranks on Mr. Frederick, right?

17        A    Yes.  I was a new employee and it seemed kind of

18   humorous from the beginning and then when I found out that

19   they were just -- it was a daily thing against Mr.

20   Frederick, it was brought to my attention and I thought it

21   was evilness and I addressed it, I took it to supervisors.

22        Q    Did you see any pranks being pulled on Al Parker?

23        A    No, I didn't.

24        Q    And did Mr. Parker seem to have a good working

25   relationship were everybody in the shop?

1      A    Mr. Parker seemed to -- everybody used to --

2    seemed to -- how do I word this -- Mr. Parker was a thirty-

3    year employee over everybody.  He probably had twenty-five

4    years over everybody in there.   So they treated him with

5    respect, just on that basis.

6      Q    So you're saying that you knew Mr. Parker had been

7    employed by Columbia Oldsmobile for over thirty years?

8      A    Yeah, it was known the day I walked in.

9      Q    This incident with you and Al Parker, did Al ask

10   you several times to retract the oil hose all the way

11   because it hung low and would be in the way and Al said he

12   would hit his head on it if it was not hung up all the way?

13   Did he tell you that?

14     A    Well, and my response to that was there is only

15   two oil dispensers on that side and there is probably

16   fifteen technicians that change oil.  So my response to Al

17   is, "I retracted it, talk to the other technicians".  That's

18   what my response was.  Yes, he did say that to me.  And I

19   told him, "There is other technicians that you need to

20   notify."

21     Q    Did some of the people that came in about this

22   incident and witness this incident tell you that you should

23   respect your elders?  Do you recall any of that occurring?

24     A    Well, no, but can I answer?

25          MR. TAMARKIN:  Yes.

Page 369

1    Q.  – that appears on Exhibit 29?

2    **A.  Yeah, that's my signature.**

3    Q.  Is that Bob Branigan's signature that appears

4    on Exhibit 29?

5    **A.  I don't know.  Says Robert.**

6    Q.  What's your printing say?

7    **A.  What do you mean?**

8    Q.  Well, what's your comment on the bottom?

9    **A.  Didn't two lugs on passenger and rear front.**

10   **That's what it looks like.**

11   Q.  What's it say?

12   **A.  It looks look to me, didn't two lugs on**

13   **passenger's rear end front.**

14   Q.  What are you trying to say there?

15   **A.  I'm not trying to say anything.  I probably**

16   **just was provoked from signing disciplinary acts, I**

17   **probably just put anything down there.**

18   Q.  Look at the repair order which is attached,

19   next document, where it says 6,000 mile service, 52.

20   That's your number, right?

21   **A.  Uh-huh.**

22   MR. TAMARKIN:  You have to say yes.

23   **A.  Yes.**

24   Q.  Again, do you recall this particular

Page 370

1    disciplinary action occurring?

2    **A.  No, I don't recall it.  I had several.  This is**

3    **just another one.  I don't recall it, no.**

4    Q.  That Bob Branigan was saying to you that you

5    had performed defective and improper work?

6    MR. TAMARKIN:  Objection.

7    **A.  I don't recall it.  I mean, I was in there**

8    **every day.  Look at the dates on the documents.**

9    (Exhibit 30 was marked for identification.)

10   Q.  Let me show you Exhibit 30.

11   **A.  Are you giving me a copy?**

12   Q.  Just wait one second.

13   MR. TAMARKIN:  You'll get the original.

14   **A.  He said, "let me show you," then he started**

15   **reading.**

16   Q.  Let me show you Exhibit 30.  This is an

17   employee disciplinary report dated November 15, 2000, for

18   improper conduct.

19   First, is that your initials that appear on

20   this document, Exhibit 30?

21   **A.  This is just a scribble.**

22   Q.  Well, is that your initials?

23   **A.  I can't recall.  I just started just –**

24   Q.  November 15 at 2:45 p.m. Mr. Stewart was

Page 371

1    walking past Jeffrey going to the parts department and

2    overheard Jeffrey tell Scott Dick to go ahead and just get

3    it off his chest in a taunting manner.

4    Mr. Stewart reprimanded Jeffrey and told him

5    that taunting other employees would not be tolerated and

6    all incidents are to be brought to the attention of the

7    service manager.  See that?

8    **A.  Uh-huh.**

9    Q.  Do you recall that happening?

10   **A.  Yeah.**

11   Q.  Tell me –

12   **A.  This incident I do.**

13   Q.  Huh?

14   **A.  This incident I do recall.**

15   Q.  Tell me what you recall.

16   **A.  This one is valid.**

17   Q.  Please?

18   **A.  This one is valid.**

19   Q.  What do you mean "valid"?

20   **A.  It's more like something that Mr. Stewart did**

21   **actually witness.**

22   Q.  What did Mr. Stewart witness?

23   **A.  He witnessed me telling Scott Dick to get**

24   **whatever is on his chest, let it out.**

Page 372

1    Q.  What was – what were you saying – what did

2    you mean when you said to Scott Dick, go ahead, just get it

3    off your chest?

4    **A.  Well, I was – excuse my language, I don't**

5    **speak like this, I was a mother fucker and a black**

6    **son-of-a-bitch.  And I told him he woke up on the wrong**

7    **side of the bed, why don't you just get it off your chest.**

8    Q.  So you're saying that he said to you that

9    you're a mother fucker and a black son-of-a-bitch?

10   **A.  Yes, he did.**

11   Q.  That's what he said to you, Scott Dick?

12   **A.  Yes.**

13   Q.  And then what did you say back to him?

14   **A.  Get it off your chest.  You must have woke up**

15   **on the wrong side of the bed.  Why don't you get whatever**

16   **is ailing you off your chest, I don't sleep with you.**

17   Q.  What was Mr. Dick's response?

18   **A.  His response was pretty much what he said**

19   **before I made my statement.  That's when Mr. Stewart**

20   **drifted past in the parts, he says he was going and he**

21   **observed my response.**

22   Q.  He observed your response?

23   **A.  Yes.**

24   Q.  Your response was go ahead, get it off your

8 (Pages 369 to 372)

Page 389

1     (A recess was taken from 11:28 to 11:45.)
2     Q.   Sir, how were you referred to Mr. Tamarkin?
3   How did you get to Mr. Tamarkin?
4         MR. TAMARKIN: Objection. You can answer.
5     A.   I called another attorney and he told me that
6   he was a fine attorney.
7         MR. TAMARKIN: Objection. Move it be stricken.
8     Q.   So you called another attorney, this attorney
9   then referred you to Mr. Tamarkin, correct?
10    A.   Yes, I think that's what I did. I can't really
11  say. Somebody directed me to him that wasn't an attorney.
12    Q.   Who's the other attorney you called?
13    A.   I can't recall.
14        MR. TAMARKIN: Objection.
15    Q.   I'm just trying to -- what document or what
16  evidence or what material would there be to indicate when
17  you first saw Mr. Tamarkin?
18    A.   What document?
19    Q.   Yeah.
20        MR. TAMARKIN: Objection. That would be my
21  information. That's privileged. I'm not going to
22  let him answer that.
23        If you have some documents that reflect when
24  you first saw me, you can answer.

Page 390

1     A.   I don't know.
2         MR. TAMARKIN: Unless you've given those
3   documents to me as work product.
4     A.   I told him I couldn't answer it.
5     Q.   Sir, let me go back and show you Exhibit 4,
6   which is an affidavit that you signed at the EEOC on August
7   8, 2000. See it says here August 8, 2000?
8     A.   Uh-huh.
9         MR. TAMARKIN: Say yes.
10    A.   Yes.
11    Q.   Had you consulted with Mr. Tamarkin before that
12  date August 8, 2000?
13        MR. TAMARKIN: Objection. Asked and answered.
14  He didn't know.
15    A.   I don't know.
16    (Exhibit 33 was marked for identification.)
17    Q.   Let me show you Exhibit 33. This is an undated
18  employee disciplinary report. Says brake fluid was not
19  topped off on the 6,000 mile service on October 10, 2000.
20  Repair order number 221849.
21        Customer had to return on October 13, 2000 with
22  brake light coming on. Brake fluid was low.
23        You see this, employee disciplinary report?
24    A.   Yes.

Page 391

1     Q.   It's for defective and improper work. Do you
2   see that?
3     A.   Uh-huh.
4     Q.   True?
5     A.   Yes, I see it.
6     Q.   You would agree that if brake fluid was not
7   topped off on 6,000 service, that it would be defective and
8   improper work, correct?
9     A.   Depends on what vehicle this was. They
10  actually had a recall on brake lights coming on, on the
11  Alero. So it depends.
12        Brake lights shouldn't come on. So it's
13  improper work either way from the manufacturer or --
14    Q.   If it was a vehicle other than an Alero and the
15  brake fluid was not topped off, that would be defective or
16  improper work, correct?
17    A.   Yeah.
18    Q.   Now, is that your signature that appears on
19  this employee disciplinary report?
20    A.   It looks like it.
21    Q.   And there's printing underneath that says agree
22  with complaint?
23    A.   Yeah.
24    Q.   So you agreed with that complaint?

Page 392

1     A.   It probably was low enough to make the light
2   come on but it was still at the maximum level. I remember
3   this one, yes.
4     Q.   How could it be at the maximum level and
5   still --
6     A.   They have the line on it. You can actually
7   even overfill a master cylinder.
8         The maximum level, the reservoir still has
9   capacity to put more fluid in. So --
10    Q.   Go ahead.
11    A.   If it goes up a hill it tilts and the censor,
12  it tends to -- I mean, several vehicles the lights then
13  came on and it wasn't just me. I topped fluid off. I
14  mean, I went in, I topped fluid off for other technicians
15  that the light came on.
16        Where's the repair order on this particular
17  one?
18    Q.   You agree in performing a 6,000 mile service
19  you're supposed to top off the brake fluid, right?
20    A.   All fluids, yeah.
21    (Exhibit 34 was marked for identification.)
22    Q.   I'll show you Exhibit 34. This is a time card.
23  It shows for June 8, first entry where it says at the top,
24  first day, says June 8:25. You see that?

13 (Pages 389 to 392)

Page 393

1    A.  Not legible but I see the first day.
2    Q.  You agree you're supposed to be there at 8:00,
3  right?
4    A.  Uh-huh.
5    Q.  True?
6    A.  Yeah.
7    Q.  Look at the next day.  It says second day.  It
8  says June 20, 8:44.  You see that?
9    A.  Uh-huh.
10    Q.  Again, you're supposed to be there at 8:00
11  a.m., right?  Correct?
12    A.  Yes.
13    Q.  The third day June 21, says 8:55.  You see
14  that?  Again, you're supposed to be there at 8:00 a.m.,
15  right?
16    A.  Uh-huh.
17    MR. TAMARKIN:  Say yes.
18    A.  Yes.
19    Q.  The next day, fourth day, says June 22, 8:22
20  a.m.  See that?
21    A.  Yes.
22    Q.  Again, you agree you're supposed to be there at
23  8:00, right?
24    A.  Yes.

Page 394

1    Q.  The fifth day, June 23 says 8:25 a.m.  See
2  that?
3    A.  Uh-huh.
4    MR. TAMARKIN:  Yes.
5    A.  Yes.
6    Q.  Again, you're supposed to be there at 8:00
7  a.m., right?
8    A.  Uh-huh.
9    Q.  Yes?
10    A.  Yes.
11    Q.  Why was it you were late that entire week?
12    A.  Because this is my time card and it's just
13  another way to incriminate me.  They knew I was catching a
14  bus, Mr. Peters, Mr. Branigan, Mr. Stewart.  I caught the
15  bus to work.
16    Being that at Kenwood Montgomery it runs every
17  other hour, which if I caught it — if I got there at 7:00
18  I would be sitting out there on the porch of Columbia
19  Oldsmobile, which was not permitted by Montgomery
20  Police Department.
21    And I told them I would vary from 15 minutes
22  late to — I mean, I clocked in at that time.  I didn't
23  doctor my time card.
24    So it varies from the Metro bus schedule, 10

Page 395

1  minutes, 12 minutes.
2    I'm supposed to be off at 5:00, too, but it
3  doesn't read that way also.
4    Q.  In fact, the first day says 1602, which I
5  believe is 4:02?
6    A.  Okay.  The first day of what?  When is this —
7  the date ending period?  I can't even make out anything on
8  it.  Yours looks more legible than mine.
9    Q.  Did anybody at Columbia keep a record of times
10  that you were late?
11    A.  I don't know.  I assumed that I was being
12  watched daily.  So I guess somebody was keeping time.
13    Q.  Well, is it your position that you were late
14  every day?
15    A.  Yeah.  I caught the bus.  Mr. Peters and
16  Mr. Branigan and Mr. Stewart was aware of compensating that
17  Mr. Al Parker was there at 6:30 so, you know, he came in at
18  6:30 for some reason.  He was allowed to come in at 6:30.
19    Q.  You told me earlier that you couldn't get
20  there.
21    A.  I couldn't get there.  I mean I couldn't get
22  in.
23    Q.  Why did Al Parker get in?
24    A.  I don't know.  Same way he — different

Page 396

1  complaints on me, I guess.  I don't know.
2    But, no, the answer to the question is, I
3  didn't — wasn't aware that somebody kept records of — I
4  thought my time card did that.
5    Q.  Your time card would then show that you were
6  late —
7    A.  Late.
8    Q.  — for the most part?
9    A.  Or if I left early, yeah.
10    Q.  And you were cautioned about that during the
11  course of your employment, right?  You are told, hey, look,
12  you're supposed to be here at 8:00?
13    A.  No, I was never told that.
14    Q.  You were told in the beginning you were
15  supposed to work from 8:00 to 5:00, right?
16    A.  Yes.  Then I explained my circumstances about
17  my transportation and management compensated the 12 minutes
18  to 20 minutes that it took me to get to work, being that I
19  had public transportation.
20    Q.  So your position is that you went and talked to
21  Bob Branigan and explained to him —
22    A.  Absolutely.
23    Q.  — that you were going to be late and he
24  accepted that; is that right?

**14 (Pages 393 to 396)**